LONNIE WEEKS, JR.

V.

COMMONWEALTH OF VIRGINIA

Record No. 940335

November 4, 1994

Present: All the Justices

*William J. Baker; Daniel J. Morissette (DePolo & Morissette,* on brief), for appellant.

*Robert H. Anderson, III, Assistant Attorney General (James S. Gilmore, III, Attorney General,* on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

On February 24, 1993, Virginia State Trooper Jose M. Cavazos was shot and killed by defendant Lonnie Weeks, Jr., in Prince William County. Subsequently, defendant was indicted for the felonious, willful, deliberate, and premeditated homicide of the law enforcement officer, when such killing was for the purpose of interfering with the performance of the trooper's official duties. Code § 18.2-31(6). Defendant also was charged with grand larceny of a motor vehicle, Code § 18.2-95, and use of a firearm in the commission of murder, Code § 18.2-53.1.

Following several pretrial hearings, including a hearing on defendant's motion to suppress his confession, defendant was tried by a single jury during five days in October 1993. As the trial began, defendant pled guilty to the grand larceny and firearm charges. The court subsequently sentenced defendant to imprisonment for ten-year and three-year terms respectively on those charges.

The jury found the defendant guilty of the capital murder charge and, during the second phase of the bifurcated capital proceeding, the jury fixed the defendant's punishment at death for the capital offense based upon the vileness predicate of the capital murder sentencing statute. Code § 19.2-264.4.

Later, the trial court considered a probation officer's report and heard testimony from the officer relevant to punishment. The court then sentenced the defendant to death for the capital murder.

The death sentence is before us for automatic review under Code § 17-110.1(A), *see* Rule 5:22. As required by statute, we will consider not only the trial errors enumerated by the defendant but also whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. Code § 17-110.1(C).

There is no conflict about any relevant fact in the case. In early February 1993, defendant, who was age 20, a North Carolina resident, and on probation for a 1992 drug conviction, participated in the burglary of a residence in the Fayetteville, North Carolina area. During the course of that crime, defendant obtained a set of keys to a 1987 Volkswagen Jetta automobile parked at the residence, and stole the vehicle. Later that month, defendant drove the vehicle to Washington, D.C., intending to sell it or trade it for drugs. Defendant carried in the vehicle a Glock Model 17, nine millimeter, semi-automatic pistol loaded with hollow-point bullets. According to the testimony, the bullets were designed for police use, not target practice or hunting; this type of bullet is referred to as a "man-stopper."

During the late evening of February 23, defendant was riding as a passenger in the vehicle being driven by his uncle, 21-year-old Lewis J. Dukes, Jr., a resident of the District of Columbia. The pair was travelling en route from Washington to Richmond southbound on Interstate Route 95.

Around midnight, Trooper Cavazos was operating radar from his marked police vehicle parked in the highway medium monitoring southbound traffic. The Volkswagen driven by Dukes passed the trooper's position at a high rate of speed. The officer activated his vehicle's emergency lights and proceeded to chase the vehicle occupied by defendant. After travelling a brief distance, and passing other vehicles by driving on the right shoulder of the highway, Dukes brought the car to a stop on the Dale City exit ramp, in a dark, remote area.

The trooper pulled his patrol car to a stop behind the Volkswagen, which he approached on foot on the driver's side. Upon the officer's request, Dukes alighted and was standing toward the left

rear of the Volkswagen when the trooper asked defendant to step out of the vehicle.

Defendant complied with the officer's request and alighted on the right side of the vehicle as the trooper was near the left side. As defendant left the vehicle he was carrying the fully loaded pistol. He then fired at least six bullets at the officer, two of which entered his body beside the right and left shoulder straps of the protective vest the trooper was wearing. The officer was immediately rendered unconscious and fell to the pavement, dying within minutes at the scene with his police weapon in its "snapped" holster.

Defendant, with Dukes as a passenger, then drove the Volkswagen from the scene and parked it on the lot of a nearby service station. Defendant returned to the scene of the crime on foot and retrieved Dukes' District of Columbia driver's license that had been dropped on the pavement. Defendant rejoined Dukes, and they were found by police shortly thereafter in the parking lot of a nearby motel.

On appeal, defendant assigns 47 alleged errors committed by the trial court. The defendant has not briefed or argued ten of those assigned errors (Nos. 4, 5, 6, 7, 8, 17, 26, 31, 38, and 39); hence we will not consider them. *Jenkins* v. *Commonwealth*, 244 Va. 445, 451, 423 S.E.2d 360, 364 (1992), *cert. denied*, 507 U.S. _____, 113 S.Ct. 1862 (1993). In addition, defendant effectively presents no argument in support of five of those alleged errors (Nos. 16, 34, 44, 45, and 46). Typical of the argument in support of those five is the following conclusional statement on brief in support of No. 45: "This error of the court violated the defendant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States and Article I, §§ 8, 9 and 11 of the Constitution of Virginia." We have considered these so-called arguments and find no merit in any of the five.

The remaining assignments of error emphasized by defendant present questions dealing with defendant's detention before his arrest, his confession, requests for a scientific investigation and expert assistance in the fields of ballistics and pathology, the seating of one juror who was challenged for cause, and use during the trial's penalty phase of victim impact evidence.

First, defendant contends that he was detained for approximately two hours before he was arrested and that this constituted

an illegal arrest without probable cause. Because the arrest was illegal, defendant argues, the trial court erred by admitting in evidence defendant's statements to police that were the product of the illegal arrest.

The facts relevant to this issue were presented both at a pretrial suppression hearing and during the trial. The evidence showed that Prince William County police officer James C. Virgil, Jr., was dispatched to the scene of the crime about 12:53 a.m. on February 24, and began searching the immediate area for possible suspects. Shortly, Virgil saw defendant and Dukes walking in the rear parking lot of the motel located about one-half mile from the scene. The men, who were walking close together toward Virgil's marked police car, "turned back around and started to walk away" from the car. Then the pair "started to split apart. One subject was going to the left and one going to the right." When the officer was 15-20 feet from them with the vehicle's headlights and spotlight operating, he stopped the vehicle and began to step from the car. At that point, the men "immediately" threw "both their hands up in the air" and one said "Don't shoot." Virgil then said, "Police. Don't move. Can I talk to you all?"

Virgil approached the men and said, "Is it okay if I pat you down for my safety?" Defendant said "go ahead." Virgil felt the outside of their clothing and seized nothing from either man. At the time Virgil noticed that defendant "was breathing heavily and was sweating profusely." Defendant was wearing a plaid shirt, blue jeans, and no jacket in 29-degree weather. The officer began asking "just basic casual talking questions." The men produced identification with defendant showing a North Carolina driver's license.

When the officer asked, "What are you all doing here?" defendant said they had been "dropped off" at the motel parking lot by a relative several hours earlier to await "two girls from Washington, D.C." While there, defendant said, "We heard the shots." Virgil asked, "What shots?" Without directly responding to that question, defendant stated that he ran "to where the shots came from" and saw a State Trooper on the ground who had been shot. Defendant said that he "ran over to the trooper and he rolled the trooper over to help him." Defendant stated that as other police officers arrived at the scene, he returned to the motel parking lot.

Virgil then asked defendant if the pair "would mind" remaining at the motel to await an investigator to interview them, inasmuch

as they were the only persons who had heard the shots and defendant had been to the scene. Defendant agreed, stating "that's fine."

In a few minutes, Prince William County police officer Lyle Denny arrived to assist Virgil. Denny made "a pat down" of defendant and removed from defendant's left trouser pocket "a group of Volkswagen keys." After examining the keys, Denny returned the keys to the pocket.

Because of the cold weather and the fact that defendant was not wearing a jacket or sweater, Virgil asked the pair whether they would like to sit in his police car. Defendant replied, "I thought you'd never ask. Sure." The two men entered the back seat of the vehicle. Even though the pair could not open the rear doors from the inside, they did not ask to get out. They were not restrained with handcuffs or similar devices. A plastic barrier separating the front and rear parts of the vehicle was in the "down" position, enabling them to speak easily with Virgil when he was in the front seat.

A short while later, upon defendant's request, he was taken to the motel and permitted to make two telephone calls. After making the calls, defendant asked "if he could go get some food and something to drink up at" the service station. About the same time, Virgil learned from the police radio that county officers had located "a suspicious vehicle" at the service station, about 75 yards from the motel lot. Virgil responded to Weeks' request with, "Do you mind holding off right now? . . . I can't let you do that right now, if that's okay with you." Defendant said, "Fine."

A few seconds later, Virgil learned from another radio transmission that the "suspicious" vehicle was a Volkswagen bearing North Carolina license plates. Recalling that defendant had Volkswagen keys in his pocket and carried a North Carolina operator's license, Denny asked defendant, who was inside the police vehicle, "where the keys that were in his pocket were." Defendant responded, "What keys?" The officer asked defendant to step out of the vehicle and "patted" defendant's pants pockets, finding no keys. Then the rear seat of the vehicle was lifted, and the keys were found directly under where defendant had been sitting. When the officer showed the keys to defendant, he said, "Those aren't my keys."

About 2:45 a.m., after defendant had been with Officer Virgil for about two hours, state police officers arrived to question de-

fendant and Dukes. Near 3:00 a.m., state police Special Agent J. K. Rowland met defendant in the motel lobby. Rowland "explained to him that he was not under arrest" and asked defendant "if he would like to talk . . . about what he had seen up on Interstate 95." Defendant, who Rowland testified was "free to leave at that time," conducted an interview with defendant in private in one of the motel rooms.

We do not agree with defendant's contention that his two-hour detention while being questioned by Officers Virgil and Denny violated his Fourth Amendment rights under *Terry* v. *Ohio*, 392 U.S. 1 (1968), and its progeny. *Terry* is not implicated here because, as the trial court found from the undisputed facts, defendant consented to the detention and generally agreed to cooperate with the police. Just as a defendant may consent to a search, he may also consent to what would otherwise amount to a seizure of his person. *Limonja* v. *Commonwealth*, 8 Va. App. 532, 539-41, 383 S.E.2d 476, 480-82 (1989), *cert. denied*, 495 U.S. 905 (1990).

At every step in the questioning during the whole two-hour period, the defendant readily agreed to the detention. He consented to the initial "pat down," acquiesced to questioning, accepted the invitation to enter the police car, agreed not to go to the service station for food and drink, acquiesced to a second and third "pat down" of his trouser pockets, and agreed to be interviewed alone in the motel room by Rowland. "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." *Florida* v. *Bostick*, 501 U.S. 429, 439 (1991).

Next, defendant contends that the trial court erred in denying his motion to suppress the confession made to Special Agent Rowland because the authorities failed to scrupulously honor his request to remain silent.

The facts relevant to this issue show that as Rowland questioned defendant in the motel room, Rowland became "more and more suspicious" of defendant. Even though defendant "was free to leave" at that point, Rowland advised defendant of his constitutional rights according to *Miranda* v. *Arizona*, 384 U.S. 436 (1966), as a precaution at 7:40 a.m. Defendant then exercised his right to remain silent and wrote, "Do not want to discuss case any further," on the "Advice of Rights" form that he signed. Rowland honored this request, and ceased questioning.

At 7:50 a.m., Rowland was advised by another investigator that Dukes had just stated that defendant shot the trooper. Rowland arrested defendant at 7:52 a.m.

Subsequently, defendant was taken before a magistrate and then to the Adult Detention Center in Manassas. Later that morning, classification officers in the jail routinely questioned defendant about his physical and mental state; no attempt was made to elicit information about the crime. During the interview, defendant indicated he was considering suicide because he had shot the trooper. Defendant also voluntarily wrote a letter to a jail official admitting the killing and expressing remorse. Defendant does not contest either of these admissions but attacks the constitutional validity of the following interview.

Near 6:00 p.m. on February 24, defendant was brought to the lounge of the local prosecutor's office where Rowland again interviewed him; additional information had been developed by the police during the day between the termination of the first interview and the beginning of this second interview. Rowland asked defendant, "Do you remember the rights I read to you earlier today?" to which defendant responded affirmatively. Rowland proceeded "to summarize the investigation through the course of the day's events to that point in time."

Among other things, Rowland told defendant that an eyewitness to the shooting had made a positive identification of him as the assailant. A witness actually had identified defendant as a person she saw at the scene after the homicide, but she had not witnessed the shooting. At the conclusion of Rowland's summary, he said to defendant, "This is your opportunity to provide your explanation as to what happened at the shooting scene." Defendant responded, "Yes, I was packing." The officer knew that "packing" meant "carrying a firearm."

The defendant then confessed to the trooper's murder. Defendant stated that when the trooper asked him to get out of the Volkswagen, he picked up the pistol and "thought about throwing it away." Instead, he saw the trooper put his hand down toward his service revolver. Defendant said he then "panicked" and shot the victim "several times rapidly." Defendant stated that he drove, with Dukes as a passenger, to the service station, placing the pistol under the front floor mat of the Volkswagen. This interview lasted about one hour during which defendant readily an-

swered questions and did not invoke his right to remain silent or any other constitutional right.

In support of his attack on the validity of the confession, defendant notes that he made no request to speak with the police after he exercised his right to silence at 7:40 a.m. Instead, he points out, he was held in jail and transported to the prosecutor's office about ten hours later. He notes that at the time of the interview he was restrained in handcuffs and leg irons, being questioned by the same officer to whom he previously indicated a desire to remain silent. Defendant also points out that he was not "read his rights" again, merely "asked if he understood the rights read to him previously." Thus, defendant contends, the confession later introduced at trial violated his constitutional rights. We do not agree.

In *Miranda*, the Supreme Court stated that, once the required warnings have been given a person before a custodial interrogation, the interrogation must cease if the individual, "at any time prior to or during questioning," expresses a desire to remain silent. 384 U.S. at 474. At this point, the Court said, the individual has shown an intention "to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.*

Subsequently, in discussing the scope of the foregoing *Miranda* passage, the Supreme Court said: "Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Michigan* v. *Mosley*, 423 U.S. 96, 102-03 (1975). The Court held "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104. *Accord Lamb* v. *Commonwealth*, 217 Va. 307, 312, 227 S.E.2d 737, 741 (1976).

We will assume Rowland's preliminary comments at the second interview giving defendant the "opportunity" to explain his part in the crime amounted to an "interrogation." The question thus becomes whether defendant's prior election to remain silent was "scrupulously honored." We hold that it was.

■ Suggesting a case-by-case approach to determine that continued questioning was appropriate after an initial refusal to answer questions, the *Mosley* court mentioned five factors that related to the evidence in that case. First, whether defendant "was carefully advised" before the initial interrogation "that he was under no obligation to answer any questions and could remain silent if he wished." *Id.* at 104. Second, whether there was an immediate cessation of the initial interrogation, and no attempt to persuade defendant to reconsider his position. *Id.* Third, whether the police resumed questioning "only after the passage of a significant period of time." *Id.* at 106. Fourth, whether *Miranda* warnings preceded the second questioning. *Id.* at 104. Fifth, whether the second interrogation was limited to a crime that had not been the subject of the earlier interrogation. *Id.*

■ Clearly, when those factors are applied to the present case, no violation of defendant's Fifth Amendment rights occurred. Defendant was carefully advised before the initial interview of his right to remain silent, and there was immediate cessation of that interview when defendant exercised his right to silence. Moreover, ten hours, "a significant period of time," had passed between the first and second interviews, during which time defendant had confessed to the classification officers.

■ Furthermore, even though a fresh set of *Miranda* warnings was not given before the second interview as was the case in *Mosley*, defendant responded affirmatively when asked whether he remembered the "rights" that were read to him "earlier today." He then readily and without hesitation freely discussed the matter with the investigator and did not revoke his valid waiver. Under these circumstances, the initial waiver is presumed to continue and the failure to offer defendant a new set of warnings does not render the second interview unconstitutional. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Washington v. Commonwealth*, 228 Va. 535, 548, 323 S.E.2d 577, 586 (1984), *cert. denied*, 471 U.S. 1111 (1985).

■ Finally, the mere fact that the second interview involved some of the same subject matter discussed during the initial interview does not render the confession constitutionally invalid. *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991). Defendant was advised of the new facts that had been developed by the investigators, and there was no effort to persuade defendant against his will after he initially invoked his right to silence by

repeating questions about the same subject matter covered earlier. Hence, there was no violation of *Miranda* under that prong of *Mosley* as a result of the reinterrogation. *See Jackson* v. *Wyrick*, 730 F.2d 1177, 1180 (8th Cir.), *cert. denied*, 469 U.S. 849 (1984).

Next, the defendant complains about the denial of two pretrial motions, which defendant wished to be considered by the court ex parte out of the prosecutor's presence.

First, defendant filed a paper entitled "Ex Parte Motion for Disclosure of Records Maintained by the Central Criminal Records Exchange." In the motion, defendant sought copies of any criminal records pertaining to a number of individuals, including himself and Dukes, and certain North Carolina residents likely to be called as witnesses by the prosecutor. Over defendant's objection, the trial court permitted the prosecutor to attend the hearing on the motion and to argue against granting it. Following the hearing, the court denied the motion.

■ Code § 19.2-389 is codified among the statutes dealing with the duties and authority of the Exchange (CCRE), a separate division within the Department of State Police and, with a few exceptions, "the sole criminal record-keeping agency of the Commonwealth." Code § 19.2-387(A). Section 19.2-389 provides, in part, that upon "an ex parte motion of a defendant in a felony case and upon the showing that the records requested may be relevant to such case, the court shall enter an order" requiring the CCRE to furnish the defendant copies of any records of persons designated in the order on whom a report has been made to the CCRE. The statute is silent about the nature of any hearing on such motion.

■ We will assume, but not decide, that the statute is applicable to discovery in felony cases, that the defendant is entitled to be heard ex parte, and that the trial court erred in denying his motion under the statute. Nevertheless, we hold that the court did not commit reversible error because nothing in the record suggests that the trial court's rulings prejudiced defendant's right to fairly defend himself. *See George* v. *Commonwealth*, 242 Va. 264, 281, 411 S.E.2d 12, 23 (1991), *cert. denied*, 503 U.S. ___, 112 S.Ct. 1591 (1992).

Many of the persons named in the motion, including Dukes, did not testify at trial. In addition, the trial court had already ordered the prosecutor to furnish defendant before trial criminal history

information concerning any witness to be called by the prosecutor "at any hearing in or trial of this case." Therefore, the "ex parte motion" was redundant.

Second, defendant filed a paper labelled "Motion For Scientific Investigation, Ex Parte." Relying upon Code § 2.1-434.11, defendant moved the court to order a scientific investigation into certain factors surrounding the victim's death, including whether death was instantaneous as a result of the fatal wounds.

Code § 2.1-434.11 is codified among the statutes establishing a Division of Forensic Science within the State Department of General Services. That statute authorizes an attorney for an accused to request a scientific investigation, if the attorney believes in good faith that such investigation may be relevant to the criminal charge. The statute provides that the "motion shall be heard ex parte" and, if satisfied as to the correctness of the attorney's representation, the court shall order the investigation to be performed by the Division.

■ We do not reach the merits of the defendant's complaint because the issue has been procedurally defaulted. The trial court never denied the motion. At the hearing on the motion, with the prosecutor present, the trial court said that it would entertain the motion later upon defendant's showing that he had unsuccessfully sought the results of such testing that probably already had been conducted by the Division. Defense counsel did not object to this ruling; instead, he withdrew the motion as being not "timely." Because defendant acquiesced in the trial court's ruling, he may not challenge it on appeal. Rule 5:25.

Associated with defendant's claim of error relating to the request for a scientific investigation is the complaint that the trial court erred by denying his request to be heard ex parte on his motion for expert assistance in the fields of pathology and ballistics, and for denial of the request for appointment of such experts. Defendant asked that his motion for funding for expert assistance "be treated under the same procedure as required by Title 18 USC 3006A(e) in Federal Court." There is no merit to this contention.

■ We already have decided that a defendant charged with capital murder is not entitled to an ex parte hearing on his motion for expert assistance. *Ramdass* v. *Commonwealth*, 246 Va. 413, 422, 437 S.E.2d 566, 571 (1993), *rev'd on other grounds sub nom. Ramdass* v. *Virginia*, 512 U.S. ___, 114 S.Ct. 2701

(1994). In addition, we specifically have refused to apply the federal statute to state capital murder prosecutions. *Id.*

Before moving to the last two issues emphasized by defendant, we will comment on other matters raised before trial that are the subject of assignments of error. These issues warrant only a brief discussion because none of them has merit. Defendant raises related arguments regarding the trial court's partial denial of motions for bills of particulars. No challenge was made to the sufficiency of the indictment; thus, a bill of particulars was not required. *Strickler* v. *Commonwealth*, 241 Va. 482, 490, 404 S.E.2d 227, 232-33, *cert. denied*, 502 U.S. 944 (1991). Defendant has procedurally defaulted a contention that we repeatedly have rejected, that is, that Virginia's capital murder and death penalty statutes are constitutionally infirm. In support of that contention, defendant impermissibly incorporates by reference a memorandum filed on the subject in the trial court. *Jenkins*, 244 Va. at 461, 423 S.E.2d at 370 (defendant has obligation to state clearly to appellate court grounds for assertion trial court's ruling erroneous; cross-reference to arguments presented at trial insufficient).

Next, defendant raises several issues dealing with juror voir dire. He contends the trial court erred in denying individual voir dire and in refusing to allow a number of questions that he submitted to be asked of the prospective jurors. A defendant has no right to individual voir dire. *Stewart* v. *Commonwealth*, 245 Va. 222, 229, 427 S.E.2d 394, 399, *cert. denied*, 510 U.S. ____, 114 S.Ct. 143 (1993). Also, the trial court did not abuse its discretion in disallowing the questions because they were either improper, vague, argumentative, or nonspecific. *Buchanan* v. *Commonwealth*, 238 Va. 389, 402, 384 S.E.2d 757, 765 (1989), *cert. denied*, 493 U.S. 1063 (1990). And, contrary to defendant's argument, the trial court did not abuse its discretion, in this case of a white victim and a black accused, in the manner which it questioned the prospective jurors on the subject of potential racial bias. *See Turner* v. *Murray*, 476 U.S. 28, 37 (1986) (trial judge retains discretion as to form and number of questions on issue of racial bias when capital murder defendant accused of interracial crime).

Also, defendant argues the trial court erred in denying his challenge for cause of juror Frederick Pama. Responding to the question whether he knew personally anyone who was the victim of a

violent crime, Pama said, "About three years ago . . . my wife's first cousin, who was very close to us, got killed. He was a police officer, from a drug shootout, and that affects me."

Pama initially had answered many questions by the trial court and counsel which reflected his ability to serve as an impartial juror. After he answered the foregoing question, he responded to questions by the prosecutor and said he could set aside any opinion he had formed about the case and could render a decision based solely on the law, and evidence produced at trial. Finally, when asked again by the prosecutor whether he "could be fair and impartial and set aside anything" he may have heard in the past and whether he could "be fair in this matter, both to the Commonwealth and to the accused," Pama answered, "I think so."

When denying defendant's motion to strike Pama, the trial court stated that "the proposed juror did not say that it would have an impact. He said, the way I understood his answer, he was not certain if it would have an impact, but at this time it would not."

 Upon appellate review, we must give deference to the trial court's decision whether to exclude or retain a prospective juror because the trial court "sees and hears the juror;" accordingly, the trial court's decision will be disturbed only upon a showing of manifest error. *Eaton* v. *Commonwealth*, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), *cert. denied*, 502 U.S. 824 (1991) (quoting *Wainwright* v. *Witt*, 469 U.S. 412, 426 (1985)). *Accord George*, 242 Va. at 276, 411 S.E.2d at 19 (juror not automatically disqualified on account of fact son had served as pallbearer at victim's funeral).

 We find no manifest error in the court's refusal to dismiss Pama for cause. From a review of Pama's entire voir dire, we conclude that the trial court was justified in finding that Pama could be impartial during the trial. Our duty to defer to the trial judge on this subject is illustrated by Pama's final answer, "I think so," which the trial judge, not this Court, heard. The juror's emphasis on "so" in that answer conveys an entirely different meaning than if the emphasis had been on "think." On appeal, we must presume he emphasized "so."

Finally, defendant contends the trial court erred in admitting "victim impact testimony" during the penalty phase of the trial. The victim's widow, as well as state troopers who worked with the

deceased, testified about the profound effect the killing had on his surviving family and those with whom he worked.

On appeal, defendant mounts a two-prong argument: so-called "victim impact evidence" is not relevant in Virginia to the jury's sentencing decision in a capital case, and, even if it is, the evidence should be limited to the effect upon family members only and not to the effect upon nonfamily members closely associated with the victim. We will not address the latter contention because, in the trial court, the defendant did not distinguish between testimony by family members and testimony from other sources. Therefore, the defendant may not challenge on appeal the admissibility of the troopers' testimony. Rule 5:25.

Addressing the former contention, we hold that victim impact testimony is relevant to punishment in a capital murder prosecution in Virginia, and that the trial court did not err in admitting the testimony in this case. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court authorized the use of such testimony. The Court said: "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827.

Defendant's reliance on *Dingus v. Commonwealth*, 153 Va. 846, 149 S.E. 414 (1929), is misplaced. There, in a unitary criminal trial, this Court held improper a prosecutor's argument alluding to the impact of the murder on the victim's widow, because it "in no way assists in determining either the guilt or the innocence of the accused." 153 Va. at 850, 149 S.E. at 415. In contrast, under Virginia's modern, bifurcated capital procedure, victim impact evidence is probative, for example, of the depravity of mind component of the vileness predicate, which the jury in this case found as a basis for imposing the death penalty. As the Supreme Court said in *Payne*, "for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." 501 U.S. at 825.

In conclusion, defendant raises a number of miscellaneous issues dealing with evidence, jury instructions, and inquiries by the jury during its deliberations. We have considered all the arguments in support of those issues and conclude that none has any merit. Only two of those issues warrant further discussion. First, defendant claims the trial court erred in permitting Special Agent

Rowland to testify that Dukes had stated to another investigator "that Lonnie Weeks did, in fact, shoot the trooper." At trial, defendant objected to the statement specifically on the ground that it was inadmissible hearsay and generally on constitutional grounds.

The hearsay rule does not operate to exclude evidence of a statement offered for the mere purpose of explaining the conduct of the person to whom it was made; this is especially true when the evidence is not offered for the purpose of establishing guilt or innocence of the accused "but for the purpose of showing the reason for the police officers' action in arresting him." *Upchurch v. Commonwealth*, 220 Va. 408, 410, 258 S.E.2d 506, 508 (1979). *See Manetta v. Commonwealth*, 231 Va. 123, 127-28, 340 S.E.2d 828, 830 (1986). As the prosecutor argued, and the trial court implicitly found, this statement was offered to explain Rowland's action in arresting defendant at 7:52 a.m. after considering defendant not in custody 12 minutes earlier, and not to prove that defendant had in fact shot the trooper. Thus, the trial court did not err in admitting the statement.

Second, defendant contends the trial court erred in denying his motion to strike the Commonwealth's evidence on the offense of capital murder made on the ground that the evidence was insufficient to prove the element of premeditation. The question whether a defendant is guilty of a premeditated killing of the victim is usually a jury question. The intention to kill need not exist for any specified length of time prior to the actual killing; the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill. *Clozza v. Commonwealth*, 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984), *cert. denied*, 469 U.S. 1230 (1985). In deciding the question, the jury may consider, among other things, the brutality of the attack and whether more than one shot was fired. *Id.*

In the present case, the jury's finding on this element was fully supported by the evidence, and the trial court did not err in denying the motion to strike. On probation, riding in a stolen vehicle, and possessing a weapon that the evidence showed had been used in a previous North Carolina murder, defendant shot the trooper at virtually point-blank range at least six times to avoid arrest. Several of the bullet wounds, according to the evidence, probably were the result of ricochet, indicating that the trooper may have been fired upon while lying on the pavement. These and other factors surrounding the killing amply proved premeditation.

Lastly, defendant contends that the sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factor, and is excessive or disproportionate to the penalty imposed in similar cases. We do not agree.

As we have said, the jury fixed defendant's sentence at death on the capital murder conviction upon the "vileness" predicate. Defendant points to no meaningful basis for concluding that the determination was made arbitrarily. He merely says the "verdict is irreparably tainted by the error-filled process that produced it" and he is "not a person who deserves to die." On the contrary, the record amply supports the conclusion that the sentence was appropriate under the circumstances.

On the question of "vileness," the jury found that defendant's conduct in committing the offense involved "depravity of mind and/or aggravated battery." Both of these components of the vileness predicate were established. For example, defendant, in an attempt to avoid arrest, shot the trooper at least six times from close range with a high-powered revolver, two of the shots being independently fatal, under the evidence. The officer posed no threat to defendant in connection with this routine traffic stop; the trooper died with his service revolver still enclosed in its holster. Then, the defendant left and returned to the scene, falsely claiming that he attempted to render assistance to the victim when his real purpose was to retrieve incriminating evidence.

On the question of excessiveness and disproportionality, we determine whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant. Code § 17-110.1(C)(2); *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980). To assist in this determination, we consider records of all capital murder cases reviewed by this Court, including cases where life imprisonment has been imposed. Code § 17-110.1(E).

In *Smith* v. *Commonwealth*, 239 Va. 243, 271, 389 S.E.2d 871, 886, *cert. denied*, 498 U.S. 881 (1990), referring to *Delong* v. *Commonwealth*, 234 Va. 357, 372, 362 S.E.2d 669, 677 (1987), *cert. denied*, 485 U.S. 929 (1988), we compiled capital cases involving murders of police officers. *See Eaton, supra.* And, today in *Cardwell* v. *Commonwealth*, 248 Va. 501, 450 S.E.2d 146 (1994), we referred to those cases where, as here, the death sentences were based upon the vileness factor. From a consideration of all

these cases, we conclude that the death sentence in this case is not excessive or disproportionate to the punishment generally imposed by juries in the Commonwealth for similar conduct.

Consequently, we hold the trial court committed no reversible error, and we have independently determined from a review of the entire record that the sentence of death was properly assessed. Thus, the judgment of the trial court will be

*Affirmed.*