COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, Causey and Friedman
Argued at Norfolk, Virginia


BRIAN GENE SMITH

                                                    MEMORANDUM OPINION[*] BY
v.         Record No. 0180-22-1                     JUDGE FRANK K. FRIEDMAN
                                                    JANUARY 31, 2023
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                            Christopher Papile, Judge

            Charles E. Haden for appellant.

            Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
            Attorney General, on brief), for appellee.


        A jury convicted Brian Gene Smith of four counts of aggravated sexual battery of a victim

under thirteen years old, two counts of aggravated sexual battery by a stepparent, and two counts of

forcible sodomy.  By final order entered February 11, 2022, the Newport News Circuit Court

sentenced him to 200 years' imprisonment with 168 years suspended.  On appeal, Smith challenges

the sufficiency of the evidence.  He also asserts that the trial court abused its discretion by failing to

strike two prospective jurors for cause.  For the following reasons, we affirm.

                                        BACKGROUND

                                        *Voir Dire* Issues

        A grand jury indicted Smith on four counts of aggravated sexual battery of a victim under

the age of thirteen, two counts of aggravated sexual battery by a stepparent, and two counts of

forcible sodomy.  During *voir dire*, prospective juror K.M. told the trial court that she was

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

scheduled to work on one of the days set for trial. She stated that her company was "short of employees" and she was "not sure if anybody c[ould] cover [her] shift or not." In response to the trial court's inquiries, K.M. explained that she worked at a retail store and agreed to contact her employer and ask if another employee could cover her shift.

After the trial court addressed another prospective juror's concerns about understanding the English language, K.M. stated that she did not "have jury duty in [her] country" and that she "underst[ood] most of the stuff but like stuff I don't get it. I'm trying." The prosecutor asked: "If you're not understanding something, would you have any problem raising your hand and asking?" K.M. did not verbally answer this question. The defense later moved to strike K.M. for cause "based upon the language issue." The trial court declined to strike K.M. for cause, noting that the court was "comfortable with her ability to understand at this point."

Defense counsel asked the prospective jurors if they were a parent or stepparent. Many prospective jurors answered in the affirmative, including J.H. Defense counsel asked J.H. if it was "possible you might not be able to give my client a fair and impartial trial based upon the fact that you are a parent and the alleged victim in this case is the stepdaughter of my client?" J.H. responded: "It's possible. I don't know what he did."

The defense subsequently moved to strike J.H. for cause; the prosecutor noted that defense counsel did not ask J.H. whether he would be able to follow the law and the evidence and give Smith a fair and impartial trial. The trial court declined to strike J.H. and stated that the court would "follow up" with J.H. The trial court subsequently reminded J.H. of his answer to defense counsel's previous question and asked if J.H. would "be able to listen to the evidence and the law as I instruct you at the end of the trial and give both sides a fair and impartial trial?" J.H. answered: "Yes." The defense did not renew its motion to strike J.H. for cause. Both J.H. and K.M. were removed from the panel with peremptory strikes.

<u>Evidence Relating to the Sexual Abuse</u>

Smith married A.R.'s mother, Yvonne, in 2008, when A.R. was nine or ten years old. A.R. testified that sometime in 2009 or 2010, Smith began coming into her bedroom late at night and touching her breasts over and under her clothing. Smith touched her "almost every night for years," unless there were guests in the house. A.R. remembered that Smith usually came to her room between 2:00 and 3:00 a.m. "because whenever he would leave, the first thing [she] saw was the clock."

Smith stopped touching A.R.'s breasts at night for a brief period when she received a bunk bed for her eleventh birthday, because he could not reach her when she slept in that bed. After several months, however, Smith and Yvonne removed the bunk bed and Smith resumed touching A.R.'s breasts. A.R. began sleeping with her arms crossed. She recalled a specific night when Smith pulled A.R.'s arms away from her chest. A.R. kept her eyes closed and pretended that she was still asleep; she then felt Smith's penis in her hand.

A.R. recalled another night when Smith entered her room and pulled her arms away from her chest. When he tried to touch her breasts, she kicked him in the chest. Smith asked why she kicked him, and A.R. asked why he was trying to touch her. Smith claimed that he was trying to tuck her in, but he had been pulling the covers off her. After that night, A.R. began setting "booby-traps" to alert her when he entered her room. She noticed that if she "moved and looked up" when she heard him open her bedroom door, he would "immediately close the door and go back to bed" and she would be "safe." She unsuccessfully tried to place a motion-activated toy in front of the door to wake her up when he entered the room; she also arranged items into a maze on the floor to cause him to trip.

When A.R. was thirteen years old, she "got in trouble somehow" and Yvonne ordered her to lower her pants so that Smith could spank her. A.R. started hyperventilating and suffered a

"panic attack" because she did not want to expose any part of her body to Smith. When Smith and Yvonne asked what "was wrong" with her, she screamed, "Why won't you quit touching me?" After Yvonne stated that Smith was not touching A.R. at that time, A.R. "explained what had been going on" and Yvonne "confronted" Smith about it. He "denied everything" and stated that "he was just trying to make sure [A.R.] was sleeping okay." A.R. tried to tell Yvonne that Smith was touching her while she was sleeping and she did not like it. A.R. testified that she "was terrified of [Smith and Yvonne] because [she] didn't know what trouble [she] could have gotten into as a kid." After this confrontation, Smith stopped touching A.R.'s breasts at night.

When A.R. was fifteen years old, Smith caught her sneaking a boy into the house. Smith also found nude photos of A.R. on her phone. Smith threatened to show the nude photos to Yvonne. A.R. testified that she was terrified of getting in trouble because Yvonne "raised [her] to always be this perfect little child and never make mistakes." A.R. was afraid that if she got in trouble, she "would get kicked out of the family."

As Smith and A.R. "negotiated" her punishment, he "ask[ed] for certain sexual favors" from her. He asked to perform cunnilingus on A.R. until she "came" but she refused. Smith ultimately decided that he would perform cunnilingus on her for one minute. He directed her to shower, shave her "genital region," and lie on his bed wearing nothing but a towel. Smith proceeded to perform cunnilingus on A.R., putting his tongue on and inside her vagina. She was "screaming and crying and just wanting it to be over." As soon as she saw "the minute switch" on the clock, she told him to stop and pushed him off. She could not look at his face, but saw ejaculate running down his leg. A.R. ran from the room and took another shower to try to "scrub [herself] of the nastiness."

Smith subsequently "wanted to make amends" with A.R. He bought her a video game that she wanted and told her that they "were going to pretend like this never happened."

Approximately one year later, when A.R. was sixteen years old, Smith again caught A.R. doing "something wrong" and told her, "I'm going to tell your mom or we can make this disappear again." She asked what he wanted, and he replied that they could "do the same thing again." A.R. agreed because she "just want[ed] everything to disappear." Smith again performed cunnilingus on A.R. for one minute, putting his tongue on and inside her vagina.

A.R.'s Reporting of the Abuse

A.R. testified that she tried to tell Yvonne about the sexual abuse but she did not know "what it even was" or "what to call it." A.R. "tried to express" to Yvonne that "I don't know what's going on, but I know I don't like it." "[A]ny time" A.R. told Yvonne about Smith's behavior, Smith and Yvonne would "talk about it a little bit and have an argument," but by dinnertime "everything would be perfectly normal." A.R. felt "helpless," "confused," and "trapped."

In addition to Yvonne, A.R. reported the sexual abuse to three people: Yvonne's friend, Heather Rice, A.R.'s ex-boyfriend, Jeffrey Landreneau, and her friend, Trae Cloud. Rice, Landreneau, and Cloud all confirmed that A.R. had reported Smith's abusive behavior to them. Landreneau testified that A.R. told him in 2014 or 2015 that Smith had found nude pictures of her and agreed to destroy them if she allowed him to perform oral sex on her. Rice testified that when A.R. was sixteen years old, she told Rice that Smith was molesting her and that she woke up one night and Smith's penis was in her hand. Cloud testified that when he and A.R. volunteered together in 2014 or 2015, she told him that her stepfather "was sexually touching her." Cloud told his mother, who called Child Protective Services (CPS).

On cross-examination, A.R. confirmed that after Cloud's mother called CPS, two CPS officers and two police officers came to the Smith residence. The officers spoke with A.R. and Yvonne together, and with A.R., Yvonne, and Smith together; they did not speak with A.R.

alone. The officers left after approximately thirty minutes; they "found no issues" and did not remove A.R. from the home. A.R. also confirmed that she never reported Smith's sexual abuse to her father, her grandparents, her teachers, or her neighbor that was a police officer. On redirect, A.R. reiterated that she tried to tell Yvonne about the abuse multiple times, but Yvonne "didn't care," "didn't believe" her, and told her "to pretend like everything was okay." A.R. reported Smith to the police in 2019 after she joined the Air Force. She discovered that the Air Force "actually want[ed] to help people." She "got all the resources [she] could possibly want," felt "safe" and "protected," and believed that she could "get [her] story finally out and get justice."

<u>Smith Denies All Allegations and is Convicted</u>

After the Commonwealth rested its case-in-chief, Smith moved to strike the evidence, arguing that A.R.'s testimony was incredible. The trial court denied the motion, noting that A.R.'s credibility was an issue for the jury. Smith's daughter, Mackenzie Bridwell, testified that she slept at Smith's residence every other weekend and "for about a month every summer" between 2009 and 2015. Bridwell's room shared a wall with A.R.'s room, and Bridwell never saw Smith go into A.R.'s room at night.

Smith testified in his own defense. He categorically denied A.R.'s allegations that he sexually abused her. He averred that he maintained a good relationship with A.R. even after she graduated from high school and moved out of the residence. The defense then rested and renewed its motion to strike; the trial court again denied the motion. The jury convicted Smith on all counts, and the trial court denied Smith's motion to set aside the verdict. This appeal followed.

ANALYSIS

Smith contends that the evidence at trial was insufficient to support his convictions. He also contends that the trial court abused its discretion by failing to strike prospective jurors J.H. and K.M. for cause.

A. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v. Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth

and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

Smith acknowledges that a jury may convict a defendant of sexual offenses based solely on the testimony of the victim. *See Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005). Indeed, "[b]ecause sexual offenses are typically clandestine in nature, seldom involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished." *Poole v. Commonwealth*, 73 Va. App. 357, 369 (2021) (quoting *Wilson*, 46 Va. App. at 88). Smith instead asserts that "there was no explanation why A.R. waited until late December 2019 to go to the police with her accusations" and "the years-long delay in making an outcry rendered A.R.'s allegations incredible as a matter of law." We disagree.

"The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009)). This Court cannot disturb the jury's credibility determinations "unless, 'as a matter of law, the testimony is inherently incredible.'" *Id.* (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). "[T]his Court cannot say a witness' testimony is inherently incredible unless it is 'so contrary to human experience as to render it unworthy of belief.'" *Id.* (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)).

A.R. testified that Smith touched her breasts innumerable times when she was between the ages of ten and thirteen. She further recounted how Smith twice performed cunnilingus on her, once when she was fifteen years old and once when she was sixteen years old. The testimony was not inherently incredible. *See Wilson*, 46 Va. App. at 88. Smith relies on the premise that "failure to report an incident of sexual abuse for an unreasonably long period casts 'suspicion and doubt' on the victim's testimony, 'unless there is a credible explanation for such

delay.'" *Id.* We reject the assertion that A.R. failed to report Smith's sexual abuse for an unreasonably long period of time, or that she failed to explain why she delayed as long as she did.

A.R. first told Yvonne that Smith had been touching her when A.R. was thirteen years old—no more than three years after the abuse began. Although Yvonne confronted Smith, she believed Smith, not A.R. A.R. tried multiple times to tell Yvonne about Smith's behavior without success; she testified that Yvonne's continued refusal to believe her combined with her fear of getting in trouble made her feel "helpless," "trapped," and "confused."

In addition to her multiple attempts to convince Yvonne, A.R. reported Smith's sexual abuse to Rice, Landreneau, and Cloud in 2014 or 2015, as all three confirmed at trial. A.R. told Rice, consistent with her trial testimony, that she awoke one night to find Smith's penis in her hand. Landreneau confirmed that A.R. told him that Smith threatened to show A.R.'s nude photos to Yvonne unless A.R. allowed him to perform cunnilingus. A.R. told Cloud that Smith was "sexually touching her." In sum, A.R. reported the sexual abuse to multiple people on multiple occasions. The period between the onset of abuse and when A.R. unsuccessfully told Yvonne, and the delay between then and when A.R. told others, were not "unreasonably long," *Wilson*, 46 Va. App. at 88, considering A.R.'s age during this time, Yvonne's refusal to believe her, and the fact that the abuse was ongoing.

Moreover, A.R. explained to the jury why she did not report Smith's abuse to more people. Specifically, she stated that she told Yvonne, but Yvonne "didn't care" and "didn't believe" her. A.R. "figured if [her] own mother w[ouldn't] protect [her], nobody [w]ould." She further testified that she never told her father about the abuse because she "didn't really have a relationship" with him, and did not tell her stepsister, Bridwell, because A.R. "didn't really know her." Finally, A.R. explained that she reported Smith to the police in 2019 after she joined the Air Force and found the resources and support that made her feel safe and protected. Smith was

entitled to argue that the jury should not credit these explanations and should instead believe Smith's unequivocal denials of A.R.'s accusations. But there is no basis in the record for this Court to conclude that A.R.'s testimony was inherently incredible, and thereby override the jury's credibility determinations.

Smith also contends that A.R.'s testimony is insufficient to prove that he committed forcible sodomy by engaging in cunnilingus with A.R. "against [her] will . . . by force, threat or intimidation." *See* Code § 18.2-67.1(A)(2). "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015).

Smith preserved his challenge to the sufficiency of the evidence with his motion to strike and his motion to set aside the verdict. In arguing these motions, Smith asserted that the evidence was insufficient because A.R.'s testimony was inherently incredible. He did not argue, however, that A.R.'s testimony, viewed in the light most favorable to the Commonwealth, was insufficient as a matter of law to prove that he committed forcible sodomy by force, threat, or intimidation.[1] Smith does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and the Court will not apply the exceptions *sua sponte*. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (*en banc*). Accordingly, we do not consider his argument that A.R.'s testimony, viewed in the light most favorable to the Commonwealth, was insufficient to support Smith's convictions for forcible sodomy.

---

[1] In fact, Smith's trial counsel acknowledged that the Commonwealth had proven "threat and intimidation" through A.R.'s testimony.

## B. Jury Selection

Smith also contends that the trial court abused its discretion by failing to strike prospective jurors J.H. and K.M. for cause. A criminal defendant has a fundamental right to be tried by an impartial jury. *Goodwin v. Commonwealth*, 71 Va. App. 125, 135 (2019). An accused's constitutional right to trial by an impartial jury is "reinforced by legislative mandate and by the Rules of this [C]ourt." *Castillo v. Commonwealth*, 70 Va. App. 394, 422 (2019) (quoting *Justus v. Commonwealth*, 220 Va. 971, 975-76 (1980)). "It is the duty of the trial court, through the legal machinery provided for that purpose, to procure an impartial jury to try every case." *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 60 (2011) (quoting *Salina v. Commonwealth*, 217 Va. 92, 93 (1976)). In a felony case, "[t]welve persons from a panel of not less than 20 shall constitute a jury." Code § 19.2-262(B). "The [trial] court and counsel for either party shall have the right to examine under oath any person who is called as a juror," and "if it shall appear to the court that [a] juror does not stand indifferent in the cause," the court must exclude that juror from the panel. Code § 8.01-358; *see* Rule 3A:14. After the trial court removes jurors for cause, "[t]he parties or their counsel, beginning with the attorney for the Commonwealth, shall alternately strike off one name from the panel until the number remaining shall be reduced to the number required for a jury." Code § 19.2-262(C).

"[T]he test of impartiality is whether the venireperson can lay aside [any] preconceived views and render a verdict based solely on the law and evidence presented at trial." *Lovos-Rivas*, 58 Va. App. at 61 (quoting *Cressell v. Commonwealth*, 32 Va. App. 744, 761 (2000)). "Juror impartiality is a question of fact." *Goodwin*, 71 Va. App. at 136. This Court will not disturb the trial court's factual finding regarding a juror's impartiality "unless it is plainly wrong or without evidence to support it." *Id.* (quoting *Sheppard v. Commonwealth*, 250 Va. 379, 387 (1995)). We "must give deference to the trial court's decision to exclude or retain a prospective juror because

the trial court 'sees and hears the juror.'" *Id.* (quoting *Weeks v. Commonwealth*, 248 Va. 460, 475 (1994)). In assessing a prospective juror's impartiality, we review the *voir dire* of the juror "as a whole, not just isolated statements by that juror." *Id.* "[A] trial court's refusal to strike a juror for cause will not be disturbed on appeal unless that decision constitutes 'manifest error amounting to an abuse of discretion.'" *Id.* (quoting *Lovos-Rivas*, 58 Va. App. at 61).

Additionally, "[t]he right of an impartial jury requires that the jury be capable of understanding the factual issues that it must resolve." *Mason v. Commonwealth*, 255 Va. 505, 509 (1998). "[A] litigant who seeks to set aside a jury verdict or obtain a new trial on the basis of a juror's disability must demonstrate that the 'disability be such as to probably cause injustice in a criminal case to the Commonwealth or to the accused.'" *Id.* at 510 (quoting Code § 8.01-352(B)).

As the Commonwealth acknowledges, we have rejected the proposition that a trial court's erroneous failure to strike a prospective juror for cause is harmless if one of the parties uses a peremptory strike to remove that juror from the panel. *Winston v. Commonwealth*, 32 Va. App. 864, 869 (2000). "The 'statutory requirements for impaneling jurors are mandatory,' and 'any departure from a strict observance of the statutory provisions,' when done 'over the protest of the accused . . . constitutes reversible error.'" *Id.* (first quoting *Kennedy v. Commonwealth*, 168 Va. 721, 726 (1937); then quoting *Elkins v. Commonwealth*, 161 Va. 1043, 1047 (1933)).

### 1. Prospective Juror J.H.

Smith asserts that the trial court abused its discretion by failing to strike J.H. for cause. He argues that J.H.'s answer that he could listen to the evidence and the law and give both sides a fair trial did not "negate or undo" his earlier answer that it was possible that he could not be impartial. We disagree. The test of impartiality is not the absence of any preconceived views but the juror's ability to lay aside those views and render a verdict based on the law and the

evidence. *Lovos-Rivas*, 58 Va. App. at 61; *see also Taylor v. Commonwealth*, 67 Va. App. 448, 456 (2017) ("A manifest error occurs when the record shows that a prospective juror cannot or will not lay aside his or her preconceived opinion."). J.H. noted the possibility that his views as a parent could influence his ability to be impartial; however, when the trial court specifically asked if he would "be able to listen to the evidence and the law" and "be able to be fair and impartial to both sides," J.H. answered, "Yes." Additionally, J.H. affirmed earlier in the *voir dire* that he understood the presumption of innocence and was able to follow the rule of law. Accordingly, viewing J.H.'s *voir dire* as a whole, the trial court did not abuse its discretion by finding that J.H. could be fair and impartial.

### 2. Prospective Juror K.M.

Smith also contends that the trial court abused its discretion by not striking K.M. for cause because, he asserts, she did not sufficiently understand English to give him a fair and impartial trial. We again disagree.

The trial judge, who had the opportunity to observe and hear K.M. throughout the entire *voir dire*, found that she understood English well enough to impartially serve on the panel. Importantly, before K.M.'s colloquy with the prosecutor regarding her ability to understand English, K.M. and the court discussed her concerns about missing work. This discussion allowed the trial court to assess K.M.'s ability to understand English. *See Mason*, 255 Va. at 507-10 (upholding trial court's finding of English proficiency where trial court was "guided" by juror's "ability to converse" with judge). Moreover, in assessing K.M.'s later assertion that she had some trouble understanding the proceedings, the trial court could also consider that the first concern K.M. raised regarding jury service was her work schedule, not her limited understanding of English. Additionally, the United States Supreme Court has noted that "jurors are not necessarily experts in English usage. Called as they are from all walks of life, many may be

- 13 -

uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). The trial court's factual finding that K.M. could understand the proceedings was not plainly wrong, and its refusal to strike K.M. for cause was not "manifest error amounting to an abuse of discretion." *Goodwin*, 71 Va. App. at 136.

## CONCLUSION

For the foregoing reasons, we affirm Smith's convictions for aggravated sexual battery and forcible sodomy.

*Affirmed.*