COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Petty and Huff
Argued at Richmond, Virginia

PUBLISHED

JACOB SCOTT GOODWIN

v.      Record No. 1463-18-2

OPINION BY
CHIEF JUDGE MARLA GRAFF DECKER
NOVEMBER 12, 2019

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Richard E. Moore, Judge

Anthony D. Martin (Lepold & Freed, PLLC, on brief), for appellant.

Leah A. Darron, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Jacob Scott Goodwin appeals his conviction for malicious wounding in violation of Code

§ 18.2-51. He argues that the trial court erred by refusing to strike four jurors for cause. Further,

he contends that the evidence was insufficient to support the conviction. For the reasons that

follow, we affirm the conviction.

I. BACKGROUND[1]

On August 12, 2017, the appellant attended the "Unite the Right" rally in Charlottesville,

Virginia.[2] As he and a group of protestors walked past a parking garage, a skirmish broke out

---

[1] On review of a trial court's denial of a motion to strike a juror for cause and a ruling
that the evidence is sufficient to support a conviction, the appellate court views the evidence in
the light most favorable to the Commonwealth, the party who prevailed in the court below. See
Lawlor v. Commonwealth, 285 Va. 187, 223-24 (2013); Lovos-Rivas v. Commonwealth, 58
Va. App. 55, 61 (2011).

[2] As recently noted by the United States Court of Appeals for the Fourth Circuit, "the
'Unite the Right' rally was held [on August 12, 2017,] in Charlottesville's Emancipation Park to
protest the City's decision to change the Park's name from 'Lee Park' and remove a Confederate
monument from its grounds." Turner v. Thomas, 930 F.3d 640, 643 (4th Cir. 2019).

between a protester holding a confederate flag and a group of counter-protesters. The appellant joined the altercation, during which Deandre Harris, a Charlottesville resident, was injured.

The appellant was charged with the malicious wounding of Harris. After a two-day jury trial, the appellant was found guilty of the offense. He was sentenced to a term of ten years in prison and a $20,000 fine, with two years and $15,000 suspended on certain conditions.

## II. ANALYSIS

The appellant argues that the trial court erred by not striking four prospective jurors for cause because the answers that they gave about their activities and beliefs during *voir dire* showed bias. He also contends that the evidence was insufficient to support his conviction for malicious wounding because it showed that his participation in the altercation was minimal and did not establish his guilt under a concert of action theory.

### A. *Voir Dire* of Jurors 15, 23, 125, and 11[3]

The appellant suggests that the trial court should have struck Jurors 15, 23, 125, and 11 for cause because each individual displayed bias against him and was not adequately rehabilitated.

### 1. Questioning of the Challenged Jurors

On the first day of the appellant's trial, a pool of over one hundred prospective jurors was called with the goal of forming a twelve-person jury. The *voir dire* of the jury venire took place in two stages. The first stage occurred in the courtroom. During that stage, the judge explained to the group that the "purpose of th[e] process" was "to be sure that we have jurors [who] stand . . . indifferent to the cause," which he described as meaning jurors "not leaning one way or the

---

[3] This opinion refers to each juror by number rather than surname for purposes of privacy. It also addresses the motions regarding the prospective jurors in the order in which the trial court considered them during individual *voir dire*. Finally, although, these individuals were all *prospective* jurors during *voir dire*, this opinion uses the term juror rather than prospective juror for ease of reference.

other . . . before the case starts." The second stage was conducted in the judge's chambers. At that stage, select prospective jurors were called for individual questioning. During the individual *voir dire*, the appellant made a motion to strike several of the prospective jurors for cause. His motions to strike Juror 15, Juror 23, Juror 125, and Juror 11 are pertinent to this appeal.

Juror 15 indicated during the initial group *voir dire* that he had "received secondhand information about [the August 12, 2017 rally] from someone who claimed they were there." When asked to elaborate, Juror 15 explained that he had several friends who participated in the counter-protest to the rally that day. He stated that he had planned to attend the counter-protest as well but that the "events in the morning kind of stymied that." Juror 15 clarified that his friends were participating in the counter-protest with "Antifa."[4] He told the court that he did not believe the information he received from his friends would adversely affect his "ability to render judgment."

Based on his answers during the group session, Juror 15 was asked to answer additional questions in the individual *voir dire* in the judge's chambers. During questioning, Juror 15 was candid that he had friends who were in Antifa and that one of those friends was arrested at a rally that occurred in July 2017. He admitted that he was "quite familiar with" Antifa but said that he would not consider himself a member even though he had protested alongside Antifa members in the past.

Juror 15 was then asked a number of questions that came directly from a jury questionnaire that was filled out by all of the prospective jurors prior to *voir dire*. He was asked if he had participated in any rally that was sponsored by "groups such as Black Lives Matter, [S]tanding [U]p for [R]acial [J]ustice [SURJ], . . . or Antifa" within the past twelve months. He

---

[4] "Antifa" is identified as "a loose collection of groups, networks and individuals who believe in active, aggressive opposition to far right-wing movements." Anti-Defamation League, https://adl.org/resources/backgrounders/who-are-antifa (last visited Nov. 4, 2019).

answered that he had not participated in any sponsored rallies in the previous year. He was also asked by the appellant's counsel whether he had paid attention to media reports about the August 12, 2017 rally. Juror 15 said that he had "[e]xtensive" knowledge of the event through the media, social networking sites, and conversations with people. However, when asked if he believed that media accounts of an event could be inaccurate, Juror 15 acknowledged that those accounts might not be correct. He also said that he "believe[d]" that he could put aside what he had previously heard to give the appellant a fair trial.

The appellant's counsel asked Juror 15 if he could set aside any opinion he had formed about the incident and "decide these cases based solely on the evidence?" In reply, he nodded his head and said, "Yes, sir." Juror 15 was asked whether he had any information that would prevent him from being fair and impartial and whether he was close to anyone who was personally affected by the events in Charlottesville on August 12, 2017. He answered "[n]o" to both questions. Juror 15 also was asked whether he had "any personal feelings, beliefs or personal experience" that would "affect [his] ability to [be] fair and impartial to both the defendant and the Commonwealth in the case." He responded that he "d[id]n't believe so, no." Finally, the appellant's counsel asked whether, "[i]f the evidence [was] pretty brutal[,] . . . [he could] still set [his feelings] aside." Juror 15 said, "Yes, sir."

The appellant made a motion to strike Juror 15 for cause but added that he did not think that the court would grant it.[5] The judge denied the motion and noted that Juror 15 was "firm" in

---

[5] To the extent the Commonwealth contends that the appellant failed to specify a basis for his motion challenging the seating of Juror 15, the trial court nevertheless articulated its reason for denying the motion, and we consider the appellant's claim of error in this context. See, e.g., Johnson v. Commonwealth, 58 Va. App. 303, 314 n.2 (2011) (noting that an issue was adequately preserved in part because the trial court had an opportunity to rule on the issue and "made an explicit finding of fact" regarding it); see also Bethea v. Commonwealth, ___ Va. ___, ___ (Aug. 28, 2019) (explaining that the Supreme Court would consider a belated argument made by Bethea that was "presumably considered" by the trial court when it made its decision on the merits).

his answers in both the courtroom and the individual *voir dire* in chambers. The judge commented that he did not "think [that there was] any question about [Juror 15's] judgment being affected" and that Juror 15 could "separate his feelings" and be fair and impartial.

Juror 23 was also questioned in chambers. She was asked about answers that she gave on the jury questionnaire. The appellant's counsel asked her about a Black Lives Matter rally that she had attended. She explained that she had gone to that rally approximately two years earlier, while she was in college. Juror 23 also confirmed her written response that she had "very strong beliefs about these matters" but felt that she could be impartial. Counsel asked Juror 23 whether she would be "able to set . . . aside" her strong beliefs and give both the appellant and the Commonwealth a fair trial. She responded "[a]bsolutely" and that she believed she "could absolutely be impartial." The judge observed that Juror 23 "was shaking her head up and down for a long time" before counsel "finished the question," making clear that "there wasn't any doubt in her mind" about her answer.

The appellant's counsel made a motion to strike Juror 23 for cause because she had attended a Black Lives Matter rally. He acknowledged that she said that she could set aside her strong beliefs and be impartial at trial, but counsel said he simply did not believe her. The trial court denied the appellant's motion and noted that Juror 23 had stated "even more strongly" than Juror 15 that she could be impartial if selected to sit on the jury. The court pointed out that Juror 23 "had no hesitation" in her response that she could be impartial "and her demeanor . . . [was] consistent with her answers."

The appellant also requested the opportunity to question Juror 125 in individual *voir dire*. Juror 125 was asked about posts that she had seen on social media regarding the August 12, 2017 rally. She explained that she had not been the source of any posts about the rally but she had seen "pictures and stuff." She was asked whether she could set aside any opinions or any biases

that she might have and give the appellant a fair trial. She responded that she "th[ought] [she] c[ould]." Further, she stated that she had not "formed [any opinion] as of yet" and she thought that she could be fair. The appellant's counsel pressed Juror 125 on whether her answer was equivocal, and again she said that she "th[ought], yes, [she] could" be fair and impartial. The judge then asked Juror 125 whether she had formed any opinion about the appellant's guilt or innocence and whether she had heard any evidence about the case. Juror 125 answered no to both of these questions. The judge inquired whether she could set aside what she heard about the rally in social media accounts and base her decision solely on the evidence that she would hear at trial. She responded "[y]es" to these specific questions.

The appellant's counsel made a motion to strike Juror 125 for cause but again commented that he did not think that the court would grant the motion.[6] The court denied the motion and noted that even though Juror 125 at first said she *thought* she could be fair, she followed up that statement with the unequivocal assertion, "I can." The court also recognized that Juror 125 had clearly stated that she had not formed any opinion of the case and "d[id not] have any biases that [the court] c[ould] see."

Lastly, Juror 11 was questioned in individual *voir dire* about her participation with Black Lives Matter and SURJ in the counter-protest to the Unite the Right rally. She was asked whether she was "there for the violence against those people" in the area of the rally. Juror 11 explained that she had gone out for a run at 7:30 a.m. on August 12 and that after finishing her run she went to the market. She said that on her walk to the market, she "briefly participated in the beginning" of the counter-protest with Black Lives Matter and SURJ members. Juror 11 explained that she began walking back to her home after visiting the market sometime between 8:30 and 9:30 a.m., before most of the violence occurred. She expressly denied being a member

---

[6] See supra note 5.

of SURJ or Antifa.  Further, when she was asked if she had "any friend[s] who are Antifa or anything like that," she said, "No."

The appellant had a chance to ask follow-up questions after making an initial motion to strike Juror 11 from the jury venire for cause.  His counsel asked Juror 11 if she could put her support for Black Lives Matter and SURJ aside "and give [the appellant] a fair trial based only on the evidence in the case and not on [her] support of those two organizations."  In response, Juror 11 stated, "Yes, absolutely."  Counsel followed up by asking, "No matter how distasteful it might be to you?"  She answered, "Yes."

The appellant made a motion to strike Juror 11 for cause because she had been "a participant in the [counter-protest]."  The court denied the motion and stated that "her answers" and "her demeanor" demonstrated that she was not affected by her support of Black Lives Matter and SURJ "and she could be a fair juror."

2.  The Trial Court's Rulings on the Motions to Strike the Jurors for Cause

The appellant challenges the trial court's decision to deny his motions to strike Jurors 15, 23, 125, and 11 for cause.  In this case, unlike in Ramos v. Commonwealth, ___ Va. App. ___ (2019), also decided today, the appellant does not argue that the four jurors were *per se* disqualified.[7]  Instead he contends that each displayed bias sufficient to warrant striking the juror for cause.

It is uncontroverted that a criminal defendant has a constitutional right to be tried by an impartial jury.  U.S. Const. amend. VI; Va. Const. art. I, § 8.  This is one of the most fundamental rights afforded by the criminal justice system.  See Scott v. Commonwealth, 58

---

[7] The Court recognizes that in certain instances a trial court will strike a juror for cause in order to maintain public confidence in the judicial system and such a ruling appropriately falls within its discretion.  See Mayfield v. Commonwealth, 59 Va. App. 839, 846 (2012).  Here, the appellant does not argue that the trial court erred by failing to act in this manner.

Va. App. 265, 270 (2011).  In recognition of this bedrock right, the Court has recognized that "a prospective juror 'must be able to give [the accused] a fair and impartial trial.  Upon this point nothing should be left to inference or doubt.'"  Id. (alteration in original) (quoting Bradbury v. Commonwealth, 40 Va. App. 176, 180 (2003)).  It is a trial court's responsibility to ensure that jurors are free from bias.  See Griffin v. Commonwealth, 19 Va. App. 619, 621 (1995); see also Rule 3A:14 (noting a juror may be unqualified and subject to dismissal for cause if he or she has an interest in the case, has formed or expressed any opinion, or is aware of any bias or prejudice that would prevent the juror from giving the parties a fair and impartial trial).

Juror impartiality is a question of fact.  Huguely v. Commonwealth, 63 Va. App. 92, 121 (2014).  "[W]hen conducting appellate review on [a] question of fact, . . . the trial court's [finding] must be affirmed unless it is plainly wrong or without evidence to support it." Sheppard v. Commonwealth, 250 Va. 379, 387 (1995); see Huguely, 63 Va. App. at 127 (applying the plainly wrong standard to a question of juror impartiality).  When an appellate court reviews a decision to deny a motion to strike a prospective juror for cause, the Court "must give deference to the trial court's decision whether to exclude or retain a prospective juror because the trial court 'sees and hears the juror.'"  Weeks v. Commonwealth, 248 Va. 460, 475 (1994) (quoting Eaton v. Commonwealth, 240 Va. 236, 246 (1990)); see also Thomas v. Commonwealth, 279 Va. 131, 164 (2010) ("[T]he trial court is in a superior position to determine whether a juror's responses during *voir dire* indicate that the juror would be prevented or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath.").  Additionally, in assessing a juror's impartiality, the appellate court reviews the *voir dire* of each juror as a whole, not just isolated statements by that juror.  See Green v. Commonwealth, 262 Va. 105, 116 (2001).  Finally, a trial court's refusal to strike a juror for cause will not be disturbed on appeal unless that decision constitutes "manifest error amounting

to an abuse of discretion." Lovos-Rivas v. Commonwealth, 58 Va. App. 55, 61 (2011) (quoting

Barrett v. Commonwealth, 262 Va. 823, 826 (2001)).

The appellant challenges the trial court's findings that Jurors 15, 23, 125, and 11 could be

impartial.[8] The holdings in Weeks, 248 Va. 460, and Vay v. Commonwealth, 67 Va. App. 236

(2017), provide a helpful framework for analyzing the challenged rulings.[9]

Weeks, in pertinent part, dealt with the denial of a motion to strike a prospective juror

who said that he *thought* that he could be "fair" to both the Commonwealth and the accused. 248

Va. at 475. The prospective juror's equivocal answer in that case ("I think so") was given at the

culmination of a series of questions. Id.; see also Huguely, 63 Va. App. at 125 (noting that the

word "think" can have different meanings and that the "contextual determinations must be made

by the trial court during *voir dire*"). The Supreme Court found that despite the prospective

juror's response "I think so," the trial court did not commit manifest error by refusing to dismiss

the juror for cause. Weeks, 248 Va. at 475. The Court determined upon a review of the entire

*voir dire* that the prospective juror's answers to many of the questions indicated that he could be

impartial to the cause. Id.

---

[8] The appellant asserts on brief that the jurors were not properly rehabilitated after demonstrating bias. However, he did not object on this ground below, and the trial court's rulings on the motions to strike for cause do not reflect that it considered the issue of rehabilitation in its rulings. Consequently, we hold that this aspect of the appellant's argument is barred, and we do not consider it on appeal. See Rule 5A:18; Bethea, ___ Va. at ___ ; Townsend v. Commonwealth, 270 Va. 325, 332 (2005).

[9] The Supreme Court of the United States has "rightly set a high bar for allegations of juror prejudice due to pretrial publicity." Skilling v. United States, 561 U.S. 358, 399 n.34 (2010). "News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented." Id.; see also United States v. Haldeman, 559 F.2d 31, 69 (D.C. Cir. 1976) ("[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial." (alteration in original) (quoting Neb. Press Ass'n v. Stuart, 427 U.S. 539, 565 (1976))).

The Supreme Court's opinion in Weeks is particularly instructive in analyzing the arguments regarding Jurors 15 and 125 in the instant case. The appellant challenges the trial court's decision to deny his motion to strike these jurors because of answers that they gave that he characterizes as equivocal. However, both Jurors 15 and 125 had provided other unequivocal answers to questions regarding their ability to be impartial. For example, when Juror 15 was asked whether he could "decide these cases based solely on the evidence," he nodded his head and said, "[Y]es, sir." When the appellant's counsel inquired whether Juror 125 could set aside any opinions or any biases that she might have and give the appellant a fair trial, she said that she had not formed any opinion on the case. While some of the answers provided by Juror 15 and Juror 125 during individual *voir dire* were interpreted by the appellant as equivocal, the larger context provided by the record supports the trial court's conclusion that they both believed that they could be impartial and fair.

Consistent with Weeks, the trial court is entitled to great deference because the judge was able to *see and hear* the prospective jurors to determine the meaning of the questioned statements. See id.; Garcia v. Commonwealth, 60 Va. App. 262, 270 (2012) (noting that it is "th[e] judge who is best situated to determine competency to serve impartially" because jurors "cannot be expected invariably to express themselves carefully or even consistently" (quoting Patton v. Yount, 467 U.S. 1025, 1039 (1984))); see also Du v. Commonwealth, 292 Va. 555, 564 (2016) (explaining that the "bell-shaped curve of reasonability governing our appellate review" under an abuse-of-discretion standard "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie" (quoting Sauder v. Ferguson, 289 Va. 449, 459 (2015))). The trial judge's finding that the jurors could be fair and impartial was not plainly wrong, and consequently, his denial of the appellant's motion to strike them for cause on this ground was not an abuse of discretion.

The appellant also contends that the activities and associations of three of the prospective jurors were bases for strikes for cause. Jurors 15, 23, and 11 had protested with groups sympathetic to Black Lives Matter in the past. In the case of Juror 15, he also openly admitted to having friends who were members of Antifa. Additionally, Juror 11 explained during individual *voir dire* that she had briefly joined the counter-protest on the morning of August 12, 2017, before the violence had erupted. This Court's decisions in Vay and Huguely aid our analysis of this issue.[10]

In Vay, a case involving the rape of a college student, the defense made a motion to strike a prospective juror for cause who was a college sociology professor affiliated with the Women and Gender Studies Department. 67 Va. App. at 242-44, 261-62. The prospective juror had also supervised students who were "involved with the local Sexual Assault Resource Agency" and "had done research projects on the issue of sexual assault." Id. at 246. During *voir dire*, the defense moved to strike the prospective juror for cause because of "her extensive experience with sexual assault cases" that had "led her to a bias against the defendant." Id. The trial court overruled the defendant's motion, explaining that the juror was "unwavering and very credible" when she was questioned regarding her ability to be impartial. Id. The court also stated that it

---

[10] A number of Supreme Court of Virginia opinions on the issue of striking a juror for cause based on his or her feelings about the death penalty support this outcome. These cases demonstrate that the law is well settled that a juror's entire *voir dire* must be considered before an appellate court will overturn the decision of a trial court to deny a motion to strike a juror for cause. See Jackson v. Commonwealth, 267 Va. 178, 196-97 (2004) (concluding that the trial court did not err in refusing to strike a juror who initially stated that she would not consider all mitigating factors in deciding whether a life sentence or the death penalty was appropriate); Lovitt v. Commonwealth, 260 Va. 497, 510-11 (2000) (holding that the trial court did not abuse its discretion by denying the defendant's motion to strike a prospective juror for cause when that juror said that despite her past experience having five neighbors killed when she was a student in a different state, she would not be predisposed to vote for the death penalty); Vinson v. Commonwealth, 258 Va. 459, 468 (1999) (holding that the trial court did not abuse its discretion by refusing to exclude a juror even after he initially stated that he "'probably would' automatically impose the death penalty upon a finding of guilt of capital murder").

had "listen[ed] carefully" for "any hesitation and [there] was none." Id. On appeal, this Court affirmed the decision and noted that the trial court found that the prospective juror was "credible in her responses" and "never gave any answer other than she would be able to fulfill her oath as a juror." Id. at 262. The Court further addressed Vay's argument that the prospective juror's "work history rendered it impossible for her to sit indifferent in the cause." Id. The Court found that "[n]othing in Virginia law supports such a *per se* disqualification rule" and "decline[d] to adopt such a rule." Id.

In this case, Jurors 15, 23, and 11 were not directly affected by the violence that took place in Charlottesville on August 12, 2017. However, each of them had apparent sympathies that aligned with those protesting against the Unite the Right rally. The appellant's claim that the prospective jurors harbored an apparent bias because of activities in which they participated is similar to what the defense argued in Vay. Id. at 246.

Here, as in Vay, none of the prospective jurors indicated an inability to put aside their personal opinions and provide the appellant with a fair trial based on the evidence presented. See id. During *voir dire*, Juror 15 had indicated that he had protested alongside Antifa in the past, although he clarified that he did not consider himself a member of the group. Additionally, he told the court that he had not participated in any rally sponsored by Black Lives Matter, SURJ, or Antifa in the past twelve months. When he was specifically asked during individual *voir dire* whether his feelings or beliefs would "affect [his] ability to [be] fair and impartial to both the defendant and the Commonwealth in the case," he responded, "I don't believe so, *no*." (Emphasis added). He was also asked whether his friendships with Antifa members would affect his ability to give the appellant a fair trial, and he indicated that they would not hinder his ability to be an impartial juror.

Similarly, Juror 23 admitted during individual *voir dire* that she had attended Black Lives Matter rallies in the past and that she had "strong beliefs about th[ose] matters." However, when asked whether she could "set those [strong beliefs] aside" and give the Commonwealth and the appellant a fair trial, she unequivocally stated "absolutely" and nodded her head for the duration of the question and answer.

After hearing their responses to the questions posed during *voir dire*, the trial judge made credibility findings regarding Jurors 15 and 23. See id. at 262. The judge specifically found them to be sincere in their answers. He further found that their demeanor suggested that they could be fair and impartial if they were empaneled to serve on the jury. See id. at 246. The judge's findings regarding impartiality were not plainly wrong. Consequently, the trial court did not abuse its discretion in refusing to strike the jurors for cause. See id. at 262.

With regard to Juror 11, in addition to her apparent sympathies, she also briefly participated in the counter-protest on the morning of August 12, 2017. This Court has previously held that "[i]f a prospective juror 'does not stand indifferent to the cause, [s]he is not competent. If [s]he has any interest in the cause, . . . or has expressed or formed any opinion, or is sensible of any bias or prejudice, [s]he is excluded by the law.'" Lovos-Rivas, 58 Va. App. at 60-61 (quoting Spangler v. Ashwell, 116 Va. 992, 996-97 (1914)). However, the Supreme Court has explained that "[t]he opinion entertained by a juror, which disqualifies h[er], is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." Justus v. Commonwealth, 220 Va. 971, 976 (1980) (quoting Slade v. Commonwealth, 155 Va. 1099, 1106 (1931)).

In Huguely, this Court upheld a decision of the trial court to deny a motion to strike a juror who taught a class at a particular university at the time the murder victim was a student there. 63 Va. App. at 99, 127. The prospective juror taught one of the victim's friends and

- 13 -

helped that friend postpone a final exam so that student could attend the victim's funeral. Id. at 127. Despite these facts, the prospective juror was clear that neither her employment nor her connection to the victim's friend "had any impact on how she viewed Huguely's case." Id. The trial court agreed with the prospective juror's self-assessment and noted that the record contained "not a shred of indication that" the juror could not "be objective." Id. On appeal this Court upheld the decision, stating that "[w]e must defer to the trial judge's finding because it was not plainly wrong or unsupported by the record." Id.[11]

During *voir dire*, Juror 11, like the juror in Huguely, had a more specific connection to the events than just a shared ideology with the counter-protesters. Juror 11 had briefly participated in the counter-protest during the August 12 rally. The juror in Huguely had taught one of the victim's friends at the victim's university and assisted that friend in arranging to attend the victim's funeral. However, in both cases the prospective jurors professed an ability to put aside prior personal connections to the events surrounding the cases and make a decision based only on the evidence that was presented. In the instant case, Juror 11 was clear that she could "give [the appellant] a fair trial based only on the evidence in the case" uninfluenced by her support of Black Lives Matter and SURJ. When the trial court asked whether her presence at the rally on August 12 would "interfere with or prevent [her] performing [her] duties as a juror," Juror 11 responded, "No, not at all." The judge then asked whether she "would be able to listen to both sides and make a decision based only on the evidence in this case." Juror 11 unequivocally replied, "Yes." The court heard her responses to the questions during *voir dire*, took into account her demeanor, and found that "she could be a fair juror." That finding

---

[11] In Huguely, the Court also upheld the decision of the trial court to deny a motion to strike a different juror for cause. 63 Va. App. at 124-25. That prospective juror was also an employee of the university who believed that the murder had placed the school "in a bad light" and shared an opinion that "male athletes are violent." Id. at 124.

regarding her ability to be impartial was not plainly wrong.  Accordingly, the trial court did not abuse its discretion by denying the appellant's motion to strike Juror 11 for cause.  See id.; see also Thomas, 279 Va. at 141-42, 165; Weeks, 248 Va. at 475.

Finally, the appellant argues that "any doubt concerning juror impartiality should be resolved in favor of the accused."  He cites this Court's decision in DeLeon v. Commonwealth, 38 Va. App. 409 (2002), in support of his position.  In DeLeon, the defendant, who was convicted of rape, challenged the trial court's denial of a motion to strike a prospective juror for cause.  Id. at 410.  During *voir dire*, that prospective juror had indicated that her sister-in-law had been raped in another state and that the case was not prosecuted.  Id. at 411.  When asked whether knowing about that incident would affect her ability to listen to the evidence in DeLeon's case, the prospective juror, who was visibly "upset" and "fe[lt] like crying," equivocated and said that she was "not sure."  Id.  While the prospective juror indicated that she could be fair and did not believe that DeLeon was guilty of rape just because he had been charged with the offense, she also answered that she "identif[ied]" with the victim because of what happened to her sister-in-law.  Id. at 411-12.  The trial court denied a motion to strike the prospective juror for cause, "finding that [she] stated she would listen to the evidence."  Id. at 412.

This Court reversed the decision, concluding after reviewing the entire *voir dire* that the prospective juror's responses "failed to establish that she could sit as an impartial juror during the case."  Id. at 413.  The Court noted both the prospective juror's equivocal responses to questions during *voir dire* and the fact that she became upset when talking about her sister-in-law as factors that raised a "reasonable doubt as to her qualification to serve as a fair and impartial juror."  Id.

- 15 -

The appellant's case presents a very different set of circumstances than DeLeon. In DeLeon, the prospective juror clearly said that she was "not sure" that she would be unaffected by the prior experience of her sister-in-law if she was selected for the jury. Id. at 411. In this case, however, none of the challenged prospective jurors provided answers that were as uncertain as the prospective juror in DeLeon. To support his argument that Jurors 15 and 125 were uncertain in their ability to serve as impartial jurors, the appellant focuses on specific words that they used such as "think" and "believe." However, his analysis isolates those words from the complete context of the *voir dire*. See Huguely, 63 Va. App. at 125 ("[C]ontextual determinations must be made by the trial court during *voir dire*."). The appellant ignores that the trial court considered the full statements of those jurors and their respective demeanors during questioning, and not just the specific words that he highlights on appeal. For example, when asked whether his personal beliefs would affect his ability to be impartial, Juror 15 stated "I don't believe so, no." While Juror 15 used the word "believe," he also included the word "no" in his statement. Consequently, the meaning of this phrase could be interpreted differently depending on the emphasis Juror 15 placed on those two words. Clearly, the trial court was in the best position to determine the meaning of his statement. See id. Accordingly, given our deference to the trial court as the finder of fact, we must presume that the juror emphasized the word "no." See Weeks, 248 Va. at 475. Similarly, Juror 125 said she "th[ought], yes, [she] could" be fair and impartial, a point that the judge specifically referenced when he explained his reasons for denying the appellant's motion to strike her from the venire for cause. The judge explained that "even though at first [Juror 125] said she th[ought she could be fair]," she clarified that "[she] c[ould]" and had said "all along" that "she hadn't formed any opinions."

Additionally, none of the prospective jurors in this case were visibly upset like the juror in DeLeon was during *voir dire*. See 38 Va. App. at 411. In this case, the trial judge remarked

- 16 -

frequently regarding the demeanor of the prospective jurors and emphasized that their respective responses did not give him any concern about their ability to remain impartial. Moreover, it is worth noting that the judge clearly analyzed the answers and demeanor of the prospective jurors in this case because he ultimately granted two of the appellant's motions to strike jurors for cause during individual *voir dire*.[12]

The trial court's challenged findings regarding juror impartiality are clearly supported by the record. Accordingly, the court's decisions were not plainly wrong, and we hold that the trial court did not abuse its discretion by denying the appellant's motions to strike Jurors 15, 23, 125, and 11 for cause.

## B. Sufficiency of the Evidence

The appellant contends that the evidence was insufficient to support his conviction for malicious wounding pursuant to Code § 18.2-51. He argues that it showed that his participation in the altercation was minimal and did not establish his guilt under a concert of action theory.

### 1. The Altercation and the Victim's Injuries

The appellant does not dispute that he was involved in the altercation in which victim Deandre Harris was injured. The record, which includes several videos, establishes that as Harris was trying to intervene to break up an altercation, he was knocked to the concrete floor of the parking garage. Harris attempted to get to his feet, but the appellant, who had joined the skirmish, kicked Harris and thrust a clear riot gear shield into him. The shield made contact with Harris' left arm, and the combination of that contact and the prior kick knocked Harris to the ground. The appellant then kicked Harris two more times as he lay defenseless on the ground

---

[12] Further, the trial judge had earlier granted the appellant's unopposed motion to dismiss nineteen other members of the jury venire based on their answers to the jury questionnaire.

immediately before other people also began to attack him. The appellant kicked Harris at least once more as several other protesters were striking him.

As a result of the attack, Harris was transported to the hospital. He had a fractured bone in his left arm and sustained a four-centimeter laceration on his head that required eight staples to close.

Following his conviction for maliciously wounding Harris, the appellant filed a motion to set aside the jury's verdict and argued that the evidence was insufficient to prove that he had acted in concert with other protestors to inflict injuries on the victim. The trial court denied the motion and noted that "despite the fact that [a] concert of action [theory] was introduced [by the Commonwealth], the jury also could have found from the evidence that [the appellant] was guilty, in and of himself, of . . . malicious[ly] wounding" the victim. The court further explained that the appellant made contact with Harris' left arm at least twice, "once with a shield, and once when Mr. Harris was on the ground kicking." The court reasoned, based on that evidence alone, that the jury may have "believed that [the appellant] indeed caused th[e] fracture to the left arm." Ultimately, the court concluded that the conviction was "not plainly wrong" and that there was "certainly evidence to support it."

2. Sufficiency of the Evidence to Prove Malicious Wounding

The appellant challenges the sufficiency of the evidence to support his conviction for malicious wounding. He argues that the Commonwealth failed to prove that he personally caused any significant injury to Harris. Further, he contends that the evidence did not establish that he formed any intent with the others around him to support a "concert of action" theory of the crime.

The law is well established. "When the sufficiency of the evidence to support a conviction is challenged, it is [the appellate court's] duty to view the evidence in the light most

favorable to the Commonwealth and to uphold the conviction unless it is plainly wrong or without evidence to support it." Case v. Commonwealth, 63 Va. App. 14, 22 (2014) (quoting Powers v. Commonwealth, 211 Va. 386, 388 (1970)). Further, this Court is required to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn" from the evidence. Seaton v. Commonwealth, 42 Va. App. 739, 743 (2004) (quoting Kelly v. Commonwealth, 41 Va. App. 250, 254 (2003) (*en banc*)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" Chavez v. Commonwealth, 69 Va. App. 149, 161 (2018) (quoting Banks v. Commonwealth, 67 Va. App. 273, 288 (2017)). "[T]he question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Lawlor v. Commonwealth, 285 Va. 187, 224 (2013) (quoting Commonwealth v. McNeal, 282 Va. 16, 20 (2011)).

Code § 18.2-51 provides that "[i]f any person maliciously . . . wound[s] any person or by any means cause[s] him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony." The phrase "'bodily injury' [is given] its 'everyday, ordinary meaning,' which needs no technical, anatomical definition." English v. Commonwealth, 58 Va. App. 711, 718 (2011) (citation omitted) (quoting Luck v. Commonwealth, 32 Va. App. 827, 832 (2000)). This Court has previously held that "[t]o prove a bodily injury, the victim need not experience any observable wounds, cuts, or breaking of the skin. Nor must [he] offer proof of 'broken bones or bruises.'" Id. at 719 (quoting Luck, 32 Va. App. at 831-32). Additionally, "[t]o be guilty under Code § 18.2-51, a person must intend to permanently, not merely temporarily, harm another person." Johnson v. Commonwealth, 53

- 19 -

Va. App. 79, 101 (2008). The jury was instructed on the elements of this crime in Jury Instruction 19.

The appellate courts of the Commonwealth have previously found that injuries inflicted by punching or kicking can support a conviction of malicious wounding. See generally Johnson v. Commonwealth, 58 Va. App. 303, 319 (2011). This includes when the injury is accomplished by a single blow. See Burkeen v. Commonwealth, 286 Va. 255, 261 (2013) (holding that "there was sufficient evidence of violence and brutality for the circuit court to find that, although Burkeen delivered only one blow with a closed fist, he acted with malice and he intended to maim [the victim]"); Fletcher v. Commonwealth, 209 Va. 636, 640-41 (1969) (noting that when an assault with a bare fist is "attended with such circumstances of violence and brutality that an intent to kill may be presumed," a single punch can support a malicious wounding conviction); Johnson, 53 Va. App. at 104-05 (explaining that a rational fact finder could "discern an intent to permanently injure" where the defendant struck the victim with such force that the victim suffered a concussion and two cuts to his ear).

The evidence at trial included a video that showed that the appellant kicked Harris *at least* four times. It also showed that the appellant made contact with Harris' left arm with his shield before Harris landed hard on the concrete floor of the parking garage. The trial court specifically noted this evidence when it denied the appellant's motion to set aside the jury's verdict. The court explained that the jury could have found that the appellant was guilty of malicious wounding based solely on his own actions. See Commonwealth v. Perkins, 295 Va. 323, 333 (2018) (published order). The court noted further that the injury to Harris' left arm was "in and of itself . . . a[n] [injury]" significant enough to warrant a malicious wounding

- 20 -

conviction.[13]  It pointed out that the appellant made contact with Harris' left arm *at least* twice, "once with a shield, and once when Mr. Harris was on the ground kicking."  Accordingly, the trial court concluded that the jury may have "believed that [the appellant] . . . caused the fracture to the left arm."

In this case, there is no question that the evidence was sufficient to support the conviction for malicious wounding.  The appellant brutally attacked Harris.  When the appellant approached Harris during the incident, he kicked him once and struck him with his shield, knocking the victim to the ground.  The appellant then kicked Harris at least three times while he was on the floor of the parking garage.  Further, he did not abandon the attack when other men began to join the assault.  Harris suffered a large laceration to his head and a fracture to his left arm during the attack.  These injuries clearly fit into the category of bodily injuries contemplated in Code § 18.2-51.  See English, 58 Va. App. at 718-19.  Consequently, the jury's verdict was not plainly wrong or without evidence to support it, and the trial court did not err when it denied the appellant's motion to set aside the verdict.[14]

---

[13]A medical witness testified that an ulnar fracture is not the sort of fracture usually "see[n] in a fall."

[14] Additionally, the appellant contends that the evidence did not prove that any of the people involved in the beating of Harris knew each other and that the incident lasted only seconds.  He suggests that consequently the evidence was insufficient to prove a nexus "between the actions of each one of these defendants towards [the victim]" as required to prove that they acted in concert.  See generally Carr v. Commonwealth, 69 Va. App. 106, 121 (2018) ("If there is concert of action with the resulting crime one of its incidental probable consequences, then . . . all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime." (quoting Spradlin v. Commonwealth, 195 Va. 523, 528 (1954))).  However, the evidence supports the trial court's finding that the jury could have determined that the appellant was "guilty, in and of himself, of . . . malicious wounding."  Accordingly, this Court does not consider the appellant's argument disputing the sufficiency of the evidence to prove that he acted in concert with others involved in the altercation.  See Dietz v. Commonwealth, 294 Va. 123, 134 (2017) (noting that an appellate court decides cases on "the best and narrowest grounds available" (quoting Commonwealth v. White, 293 Va. 411, 419 (2017))).

## III. CONCLUSION

The record reflects that the trial court acted with due diligence in reviewing all of the answers that the potential jurors provided during the *voir dire* process and thoroughly analyzed their demeanor before rendering a decision. Accordingly, the court did not abuse its discretion by refusing to strike Jurors 15, 23, 125, or 11 for cause. Additionally, the evidence was sufficient to support the appellant's conviction for the malicious wounding. Consequently, we affirm the conviction.

Affirmed.