UNPUBLISHED

# COURT OF APPEALS OF VIRGINIA

Present: Judges Malveaux, Ortiz and Friedman
Argued at Norfolk, Virginia

TASHARA MONE JACKSON

v.      Record No. 1182-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE DANIEL E. ORTIZ
NOVEMBER 8, 2023

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Gary A. Mills, Judge

(Tyrone C. Johnson, on brief), for appellant. Appellant submitting
on brief.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Following a jury trial in the Circuit Court for the City of Newport News, Tashara Mone

Jackson was convicted of murder and conspiracy to commit murder. Jackson appeals, arguing that

the trial court erred in (1) finding the evidence sufficient to support the convictions, (2) denying her

motion to suppress statements she made to law enforcement, (3) denying her motion *in limine*

seeking exclusion of text messages sent between her and her co-conspirator weeks after the offense,

(4) refusing her proposed jury instructions, and (5) denying her motion for a mistrial. We disagree

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

with Jackson's arguments, affirm the trial court's judgment, and remand the case for correction of a clerical error.[1]

## BACKGROUND

Beginning in 2018, Jacqueline Shabazz ("Shabazz") and Jackson worked together at the United States Postal Office. Over time, their work relationship became acrimonious. In April 2021, Shabazz "crossed paths" with Jackson at a nail salon. After Jackson caused a conflict inside the salon, Shabazz retrieved a small knife from her car and poked the back tire of Jackson's car. The next day, Shabazz flew to Las Vegas with her husband, Salahuddin Ibn Shabazz ("Sal") for the weekend.

When Shabazz returned home, she saw that her car had been "destroyed." Her tires were slashed, the word "[w]hores" had been painted in red paint on the vehicle, and there was a Snickers candy bar stuck in the gas tank. Shabazz immediately sent Jackson a message via Facebook that said, "[i]t's obvious you messed my car up. Don't leave Newport News." Shabazz then decided to confront Jackson in person after learning that Jackson was having a going away party at a local establishment, Harpoon Larry's.[2] Shabazz and Sal went to Harpoon Larry's and waited until Jackson arrived, at which time the two women engaged in a physical altercation. A crowd formed as Jackson screamed for a friend to "get my gun, get my gun, grab my gun." Sal, holding a taser, put his arm out to keep the crowd away and stated, "[t]his is a one-on-one fight. . . . She came to

---

[1] The trial court initially entered a final sentencing order on August 10, 2022. It then entered a corrected order on September 26, 2022, to address a clerical error in the August 10, 2022 order. The corrected final sentencing order, however, states that the order was entered "Nunc Pro Tunc May 3, 2019." Clearly, the order should have stated that it was entered nunc pro tunc August 10, 2022, since the offenses did not occur until April 2020. We, therefore, remand this case to the trial court for correction of the corrected order.

[2] Jackson had been transferred to Florida and was expected to leave Virginia the next day.

our house. She messed our car up. She's got to answer to this." The fight lasted for less than two minutes, according to Shabazz.

After the fight, Shabazz and Sal returned home and Shabazz decided to stay in a hotel for the night with her three daughters. Sal later visited the hotel to bring additional items for the girls and then returned home. Shabazz and Sal spoke over the phone during his ride home, and they continued their conversation after he arrived at their house at around 2:00 a.m. While on the phone, Shabazz heard a knock and when Sal answered the door, Shabazz heard a man with a loud voice ask for "Charles." Sal answered that no one by the name of Charles lived there, and then Shabazz heard gunshots, a bump, and then another gunshot. Shabazz hung up the phone and called 911. She then left the hotel and returned to her house. When she arrived, the police were already there. Sal had been shot and died from his gunshot wounds at the scene.

Forensic police officer Ashlynn Morgan collected four Hornaday .380 auto cartridge casings from the entryway area of the house. Morgan also collected a cell phone in the entryway. Assistant Chief Medical Examiner Elizabeth Kinnison performed Sal's autopsy. Dr. Kinnison found four gunshot wounds to Sal's head and torso and concluded that three of them combined caused fatal injuries.

Newport News Police Detective Kayla Griffin assisted in the murder investigation. She obtained search warrants for Jackson's cell phone and the cell phone of Jackson's friend, Jeremy Pettway. The cell phone records revealed, among other things, that Jackson changed her cell phone number on the day of the murder. Detective Griffin also obtained a court order for the cameras at two different intersections in Newport News along the route between Jackson's apartment and Pettway's residence.

Detective Trevor Buchanan testified as an expert in call detail records and geolocation analysis. Detective Buchanan's review of data revealed that cell phones associated with Jackson

- 3 -

and Pettway traveled to the area of Shabazz's home on the morning her car was vandalized. Detective Buchanan presented a video at trial and provided narration regarding this incident. The detective also testified about Jackson's Google searches inquiring how to damage car gas tanks and engines.

Cell phone data revealed that Jackson and Pettway were on the phone together for twenty minutes before the murder. During the conversation, red-light cameras captured a car matching the description of Jackson's SUV driving through two main intersections in Newport News as it headed toward Pettway's house. Ring cameras from area homes and video-surveillance from several schools captured a man leaving the vicinity of Pettway's house on foot and walking toward a nearby elementary school. The SUV picked up that individual in front of the school at the same moment that the phone connection between Jackson's and Pettway's cell phones ended. The SUV was then captured driving toward Sal's residence and eventually turning onto the road where his house was located. The SUV sat stationary one to two hundred yards from Sal's residence, with his house in the line of sight, for about a minute and a half while one of the occupants left the vehicle and approached Sal's house. A few minutes later, the SUV returned in the same direction and along the same route toward Pettway's house. The SUV stopped in front of the elementary school and dropped off a person, who then walked back toward Pettway's house. The SUV then drove back on the same route in the direction from which it originally came.[3]

Jackson drove to Florida after the shooting. Over the course of several weeks, she and Pettway exchanged numerous text messages. In those texts, many of which were admitted at trial over Jackson's objection, Jackson and Pettway discussed how he was her protector and how much

---

[3] During the investigation, the police department seized Jackson's SUV. Detective Buchanan created a power point presentation showing the similarities between the SUV seen on the video-surveillance and Jackson's actual vehicle. That power point was also played for the jury.

their friendship meant to each other.  Jackson mentioned a song with lyrics that discussed committing a crime but keeping quiet about it and said that the song "explains our situation" to a "T."  In texts, Jackson expressed fear that Pettway had told his friend Ada Malone too much when he gave her his gun to hide and she suggested the police were following him.  In another text message, Jackson referred to the couple as "Bonnie and Clyde forever."  Many of the text messages describe their friendship and love for each other.  Pettway later sent a text that said, "I'm sorry I put you in this situation but very happy you still here with me."  He also wrote in a text, "[d]elete messages as we talking."  In fact, the text messages between Pettway and Jackson were deleted from their phones and only remained in the files of their respective phone companies.

Pettway asked Malone to keep his firearm at her home.  Police later seized the gun from under Malone's bed.  Forensic testing of cartridge casings recovered at the homicide scene revealed that Pettway's gun fired the shots that killed Sal.

Detective Griffin interviewed Jackson upon her arrest for first-degree murder and conspiracy to commit murder.  After being advised of her *Miranda*[4] rights, Jackson initially indicated that she did not wish to speak to the officers.  Detective Griffin explained, "if at any point in time you change your mind, and you want to knock on the door and talk to me about anything, you can.  We will come back in and talk to you."  Griffin asked if she needed water, Jackson declined, and Griffin left the room.  Jackson was left alone in the interrogation room for about an hour and fifteen minutes.  For much of this time, Jackson rested her head on her arm with her eyes closed.  The only interaction between Jackson and a detective in this one-hour-and-fifteen-minute period was a quick check by an officer to ask if she needed anything.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

When Detective Griffin returned to the room, she mentioned twice that she was waiting on a search warrant. Detective Griffin stated, "I know you didn't really want to talk today." Jackson responded "um-hum." Detective Griffin then stated,

> That's fine. I get that. After, if, you have had some time to think about it, I would like to talk to you and get your side of the story with us. Because quite frankly, it's not a matter of if you were involved. I know you were there. I have all of the details regarding that. I just know that there is a lot bullshit.

The detective then stated,

> I would really like to talk to you about this and get your side of it, but I'm not going to push anything . . . so if you decide you want to talk that's my phone number there. Like I said it's not a matter of placing you there. I know it was there, I just want to know like why. I want to know your side of the story because this is really convoluted about how there are a lot of like issues between you and the victim's wife too.

Jackson then proceeded to talk to Detective Griffin.

Jackson described the incident at Harpoon Larry's and Sal's involvement in the fight. Jackson told Griffin that during the physical altercation she had with Shabazz, Sal placed one foot on her head and used his other foot to kick her in the head twice. Jackson called the police after the incident. Jackson told Griffin that she and Pettway had no connection other than being co-workers and stated that after the incident at the restaurant she packed up her belongings and left for Florida. When confronted with the evidence of Jackson's contact with Pettway on the night of the murder, Jackson stated that Pettway called her to ask about the incident at Harpoon Larry's. She said that she did not have an explanation for why she drove Pettway to Sal's house. She stated that she did not know that Pettway had a gun and that she thought she and Pettway were going running, as they often did. She explained that when they neared the area of Sal's house, Pettway told her to stay in the car as he exited the vehicle. They did not have any discussion about what happened, and she did not hear anything after he left the car.

Before trial, Jackson filed a written motion to suppress the statements she made to Detective Griffin. At the suppression hearing, the trial court admitted the videotape of Jackson's interrogation and heard the arguments of counsel. The trial court then took the matter under advisement and later denied the motion to suppress by letter opinion dated February 8, 2022.[5] A portion of Jackson's statements were introduced at trial.

On the morning of the third day of the jury trial, after the jury was polled for attendance, the trial court explained that it polled the jury for the record in the event that "the case gets appealed." Jackson did not object to that statement at the time it was made.

After the Commonwealth rested its case, Jackson made a motion to strike. Jackson argued that there was no evidence of a specific agreement between Jackson and Pettway to kill Sal. She reasoned that "if the conspiracy case falls, then the first-degree murder even as a principal in the second degree must fall." The trial court denied the motion to strike. Jackson did not present any evidence.

Jackson submitted the following proposed jury instruction pertaining to concert of action:

> If there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime. The resulting crime must be the natural and probable result of the crime originally contemplated by the parties.

Jackson also submitted a proposed instruction concerning shared criminal intent, which stated as follows:

---

[5] Because the transcript of the suppression hearing does not include any testimony, the facts recited herein as they pertain to the motion to suppress are drawn from the factual findings set forth in the trial court's letter opinion. Before rendering its decision, the trial court reviewed the videotape of Jackson's interaction with the detectives and based its findings on her taped statement. Thus, we have reviewed the videotape for accuracy and now adopt the trial court's factual findings because they are not plainly wrong.

"Share the criminal intent" means that Tashara Jackson must have either known or had reason to know of Jeremy Pettway's criminal intention and must have intended to encourage, incite, or aid Jeremy Pettway's commission of the crime.

The trial court rejected both instructions.

After the discussion over jury instructions concluded, Jackson moved for a mistrial based upon the trial court's comment regarding the possibility that the case might be appealed. Jackson argued, "you have respectfully suggested in this jury's mind that this isn't going to be the final proceeding for Ms. Jackson." The Commonwealth responded that "a cautionary instruction would be appropriate" and suggested that the trial court instruct the jury that its "comment was simply on procedural matters that apply in general to cases and was not any kind of specific comment about the outcome of this case." The trial court denied Jackson's motion for a mistrial and declined to give the proffered cautionary instruction, but it did instruct the jury that "you are all final arbitrators of this case."

The jury convicted Jackson of first-degree murder and conspiracy to commit murder. Jackson appeals.

ANALYSIS

I. Sufficiency of the Evidence

Jackson first argues that the trial court erred in denying her motion to strike the charges of first-degree murder and conspiracy to commit murder because: 1) the evidence was insufficient as a matter of law to prove that Jackson committed those offenses, and 2) with regard to the conspiracy charge, there was no evidence of an agreement, collusion, discussion in advance, or premeditation and that the killing may have been the result of a sudden argument or a spontaneous action in the absence of any agreement. We disagree.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'"

- 8 -

*Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)). Moreover, the sufficiency inquiry "does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).

"The Supreme Court has defined conspiracy as 'an agreement between two or more persons by some concerted action to commit an offense.'" *Carr v. Commonwealth*, 69 Va. App. 106, 117 (2018) (quoting *Wright v. Commonwealth*, 224 Va. 502, 505 (1982)). "Conspiracy 'requires knowledge of and voluntary participation in' the agreement to carry out the criminal act." *Id.* (quoting *Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988)). "The agreement is the essence of the offense; it is not necessary that the crime be fully consummated." *Merritt v. Commonwealth*, 55 Va. App. 719, 734 (2010) (quoting *Hodge v. Commonwealth*, 7 Va. App. 351, 355 (1988)). "A conspiracy is committed when the agreement to commit the offense is complete, regardless of whether any overt act in furtherance of commission of the substantive offense is committed." *Johnson v. Commonwealth*, 8 Va. App. 34, 38 (1989). "A conspiratorial agreement 'often may only be established by circumstantial and indirect evidence including the overt actions of the parties.'" *Carr*, 69 Va. App. at 119 (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 636 (2011)). "Proof of an explicit agreement is not required, and the Commonwealth may, and frequently must,

rely on circumstantial evidence to establish the conspiracy." *Combs v. Commonwealth*, 30 Va. App. 802, 810 (1999).

"A principal in the first degree is the actual perpetrator of the crime. A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)). A principal in the second degree need not participate in committing the crime. *Id.* "The test is whether or not he was encouraging, inciting, or in some manner offering aid in the commission of the crime. If he was present lending countenance, or otherwise aiding while another did the act, he is an aider and abettor or principal in the second degree." *Id.* (quoting *Muhammad*, 269 Va. at 482). Indeed, "[w]hen the alleged accomplice is actually present and performs overt acts of assistance or encouragement, he has communicated to the perpetrator his willingness to have the crime proceed and has demonstrated that he shares the criminal intent of the perpetrator." *Carr*, 69 Va. App. at 114 (quoting *Rollston v. Commonwealth*, 11 Va. App. 535, 539 (1991)).

In this case, the evidence sufficiently proved that Jackson conspired with Pettway to kill Sal and that she was present at the scene of the crime assisting in and encouraging the commission of the offense. By her own admission, Jackson had a lengthy acrimonious history with Shabazz. On the night of the murder, Shabazz and Sal confronted Jackson at Harpoon Larry's in front of family and friends and the two women engaged in a physical altercation. During that fight, Sal approached Jackson and kicked her twice in the head. According to Shabazz's testimony, Jackson screamed for a friend to "get [her] gun" during the fight. After the fight ended, Jackson called Pettway's phone and they talked for twenty minutes as Jackson drove toward Pettway's house. The call ended when Jackson picked Pettway up in front of the school. She then drove toward Sal's house, parked nearby, and waited with the residence in her sight as Pettway exited the vehicle, approached the

house, and shot Sal in the head and torso. Pettway then returned to Jackson's vehicle; she dropped him off before returning home by the same route. A reasonable fact finder could conclude from these circumstances that during their twenty-minute phone conversation, Jackson and Pettway agreed to kill Sal and then took measures under the cover of darkness to accomplish their goal.

The actions of the co-conspirators following the murder also support the guilty verdicts. Jackson and Pettway exchanged numerous text messages in which they discussed their love for each other, said that song lyrics mentioning a crime with a cover-up described them to a "T," described themselves as "Bonnie and Clyde," and discussed concealing the murder weapon. Pettway gave the firearm used in the offense to his friend, Malone, who hid it under her bed. Jackson was concerned that Pettway told Malone too much. Then, upon her arrest, Jackson lied about her whereabouts on the night of the offense and told Detective Griffin that after the fight, she immediately left for Florida. She also told the detective that her only connection to Pettway was work related. It was reasonable to infer that Jackson lied to conceal her guilt.

The evidence presented at trial, along with all reasonable inferences drawn therefrom, would lead a reasonable fact finder to the conclusion that Jackson and Pettway conspired to kill Sal, that Jackson drove Pettway to the scene of the crime, and that Jackson was present at the scene aiding, abetting, and encouraging Pettway to commit the murder. Because sufficient evidence supported the jury's guilty verdict, we will not disturb the judgment on appeal.

## II. Motion to Suppress

Jackson next asserts that the trial court erred in denying her motion to suppress the statements she made to Detective Griffin, whom she maintains violated her constitutional right to have an attorney present before questioning by re-initiating conversation with her after she unequivocally invoked her *Miranda* rights.

"In reviewing the denial of a motion to suppress, 'we consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). "It is the appellant's burden to show that when viewing the evidence in such a manner, the trial court committed reversible error." *Id.* (quoting *Hairston*, 67 Va. App. at 560). In conducting our review, we are "bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence." *Malbrough v. Commonwealth*, 275 Va. 163, 168 (2008). "Thus, 'we give deference to the factual findings of the trial court but independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements.'" *Shiflett v. Commonwealth*, 47 Va. App. 141, 145-46 (2005) (quoting *Jackson v. Commonwealth*, 267 Va. 666, 673 (2004)).

The Fifth Amendment to the United States Constitution guarantees that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Pursuant to *Miranda*, "[u]pon taking a suspect into custody, police are required to warn him of his right to an attorney and the right to remain silent during questioning by police." *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020). "If the defendant indicates that he wishes to remain silent at any point prior to or during questioning, 'the interrogation must cease.'" *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). "*Miranda*'s prophylactic safeguards are designed to protect the individual's constitutional right to be free from being 'compelled in any criminal case to be a witness against himself.'" *Id.* at 578 (quoting U.S. Const. amend. V). However, "[t]he constitutional privilege guards against only one form of self-incrimination: *compelled* self-incrimination." *Id.*

The Commonwealth does not dispute that Jackson was in custody for purposes of *Miranda*; nor does the Commonwealth contest that initially Jackson clearly and unequivocally invoked her

right to remain silent. Thus, the questions on appeal are whether the statements she later made to Detective Griffin were the result of interrogation and, if so, whether the continued questioning was appropriate after an initial refusal to answer questions. *Weeks v. Commonwealth*, 248 Va. 460, 471 (1994). *Weeks* recognized the following factors:

> First, whether defendant "was carefully advised" before the initial interrogation "that he was under no obligation to answer any questions and could remain silent if he wished." Second, whether there was an immediate cessation of the initial interrogation, and no attempt to persuade defendant to reconsider his position. Third, whether the police resumed questioning "only after the passage of a significant period of time." Fourth, whether *Miranda* warnings preceded the second questioning. Fifth, whether the second interrogation was limited to a crime that had not been the subject of the earlier interrogation.

*Id.* (internal citations omitted). The trial court found that the first three factors favor the Commonwealth, while the last two factors favor the defense. We agree with this assessment.

In this case, we find under the *Weeks* factors that Jackson's initial invocation of her right to remain silent was not violated. As to the first factor, we must determine whether the defendant was "carefully advised" before the initial interrogation that he was "under no obligation to answer any questions and could remain silent if he wished." *Id.* (quoting *Michigan v. Mosley*, 243 U.S. 96, 104 (1975)). The totality of the circumstances reveals that Jackson was informed of the right to counsel and the right to remain silent. When she invoked her right to remain silent, Detective Griffin left the interrogation room to complete the booking process and to seek search warrants. This was an immediate cessation of questioning, satisfying the second factor. Third, this Court must consider whether the police resumed questioning "only after the passage of a significant period of time." *Id.* (quoting *Mosley*, 423 U.S. at 106). One hour and fifteen minutes passed between Jackson's invocation of her right to remain silent and the subsequent questioning. The gap between the two interrogations was sufficient to render the second one appropriate under *Weeks* and *Mosley*.

The fourth and fifth factors weigh against the admission of the confession—Jackson was not given fresh *Miranda* warnings and the interrogation was on the same subject matter. However, "the failure to offer defendant a new set of warnings does not render the second interview unconstitutional." *Id.* (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Additionally, the "mere fact that the second interview involved some of the same subject matter discussed during the initial interview does not render the confession constitutionally invalid." *Id.* Although these factors weigh against admission, they do not per se make the confession unconstitutional and subject to suppression.

Upon her return, Detective Griffin gave Jackson a business card, expressed her understanding that Jackson did not wish to talk, and then merely offered to hear Jackson's side of the story because she knew Jackson "w[as] there" and that "there [wa]s a lot of bullshit" between Jackson and Shabazz. When Jackson clarified, "you mean at the restaurant, is that what you're talking about," Detective Griffin responded, "yeah, I know that was part of it, I know you were jumped." Detective Griffin explained that she wanted to hear Jackson's side of it and that she knew there were a lot of issues between the two women, but she was not going to push.

At that point, Jackson began to tell Detective Griffin about the acrimonious history between Jackson and Shabazz, the property damage to their respective vehicles, the fight at Harpoon Larry's, and the police response to the fight. She then explained that she left for Florida immediately following the incident. Unprompted by Detective Griffin, Jackson mentioned Sal's murder and stated that she returned to Virginia because she knew she was wanted. About an hour after Jackson began to discuss the matter, Detective Griffin asked about Jackson's relationship with Pettway and her presence at the murder scene. Jackson said she only had a work relationship with Pettway and

- 14 -

then hesitantly admitted to picking Pettway up and taking him to Sal's house on the night of the offense.[6]  However, she denied having anything to do with the murder.

Considering all the facts in the light most favorable to the Commonwealth and considering a majority of the five *Weeks* factors weigh in favor of the questioning being appropriate, the trial court did not err in denying Jackson's motion to suppress.

### III.  Motion *in Limine*

Jackson also assigns error to the trial court's refusal to exclude the text messages she and Pettway exchanged following the murder.  Jackson contends that the text messages were sent between April 11 and April 21, 2021, "after the main object of the conspiracy had concluded" and were not made in furtherance of the conspiracy.  She additionally argues that the text messages were not, as the trial court found, adoptive admissions of criminal behavior.  We find no error in the trial court's admission of the text messages, as they were admissible as adoptive admissions and statements against penal interest, probative, and relevant to Jackson's guilt.

This Court "'review[s] a trial court's decision to admit or exclude evidence' for abuse of discretion and 'will not disturb a trial court's decision to admit evidence absent a finding of abuse of that discretion.'"  *Bista v. Commonwealth*, 76 Va. App. 184, 207-08 (2022) (alteration in original) (quoting *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021)), *aff'd upon reh'g en banc*, 78 Va. App. 391 (2023).  When evaluating a trial court's evidentiary ruling, "we do not substitute our judgment for that of the trial court.  Rather, we consider only whether the record fairly supports the trial court's action."  *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).  "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred."  *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019)

---

[6] This part of Jackson's interrogation was not told to the jury.  The jury was only told about the fight at Harpoon Larry's, that Jackson said she left for Florida immediately after the fight, and that she said she only shared a work relationship with Pettway.

(quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). The "abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Carter*, 293 Va. at 543-44 (alteration in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "In determining whether the trial court made an error of law, 'we review the trial court's statutory interpretations and legal conclusions *de novo*.'" *Auer v. Commonwealth*, 46 Va. App. 637, 643 (2005) (quoting *Rollins v. Commonwealth*, 37 Va. App. 73, 79 (2001)).

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Atkins v. Commonwealth*, 68 Va. App. 1, 8 (2017) (quoting Va. R. Evid. 2:801(c)). Hearsay evidence "'is inadmissible unless it falls within one of the recognized exceptions' to the rule against hearsay." *Id.* at 7-8 (quoting *Robinson v. Commonwealth*, 258 Va. 3, 6 (1999)). "A statement may become admissible under the adoptive admission exception to the hearsay rule upon a showing of its tacit adoption by a party, as well as by more overt demonstrations of adoption." *Lynch v. Commonwealth*, 272 Va. 204, 209 (2006). "A party may manifest adoption of a statement made by another in any number of ways, including words, conduct, or silence." *Id.* "In some cases, the defendant's words or conduct may supply most, if not all, of the predicate facts that the Commonwealth must prove to bring the evidence within the adoptive admission exception." *Id.*

In this case, Jackson conceded at trial that many of her own statements contained within the text messages were admissible under the party opponent exception to the hearsay rule. *See* Va. R. Evid. 2:803(0). She also conceded that Pettway's statements against penal interest were admissible "because he's unavailable." On appeal, Jackson argues that the trial court erred in admitting other text messages because they were not admissible under the hearsay exception allowing for the admission of statements made in furtherance of a conspiracy, and she claims that

some of the text messages were not admissible under the adoptive admission exception to the hearsay rule.[7]

The record clearly indicates that the trial court did not admit any text messages under the statements made in furtherance of a conspiracy exception to the hearsay rule. Thus, we do not consider that argument. Moreover, given Jackson's concession in the trial court that all statements made against penal interest were admissible, we need only consider the statements admitted under the adoptive admission exception. We find two on the record. The first one involved her response to Pettway's comments, "I don't do back stabbing shit. I take head shots. I'm coming to u face to face," and "I'm terrible in a late [sic] of ways but far from weak male." Jackson responded that she "[l]oved" those comments, one of which eerily described "face to face" "head shots." Sal suffered shots to his head and torso.

The second comment admitted under the adoptive admission exception was Pettway's response to Jackson's comment, "It made me realize I really did but u was there for me when I couldn't count on nobody else u didn't hesitate." Pettway responded that he "[l]oved" that comment. The trial court found that Pettway, therefore, effectively agreed that he did not hesitate to be there for her when no one else was and that the text message confirmed the conspiracy.

The trial court did not abuse its discretion in admitting these two messages under the adoptive admission exception to the hearsay rule. The text messages were relevant to both the conspiracy and to the relationship between Jackson and Pettway, and they confirmed Jackson's participation in the murder. As the trial court found, the messages were relevant to the Commonwealth's theory of the case and their probative value outweighed the prejudice to Jackson

---

[7] Jackson does not assign error to any specific text message and appears to lump them together and treat them as one. However, in light of her concession that her statements against penal interest were admissible, we have reviewed the trial court's decision as to each admitted text message and the specific reason for admitting it.

in admitting them. Thus, the trial court did not abuse its discretion in denying Jackson's motion *in limine*.

## IV. Jury Instructions

Jackson next contends that the trial court abused its discretion in refusing the two jury instructions she submitted for consideration on concert of action and shared criminal intent. We disagree.

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Chibikom v. Commonwealth*, 54 Va. App. 422, 425 (2009) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "It is elementary that a jury must be informed as to the essential elements of the offense; a correct statement of the law is one of the 'essentials of a fair trial.'" *Darnell*, 6 Va. App. at 488 (quoting *Dowdy v. Commonwealth*, 220 Va. 114, 116 (1979)). "Instructions are to be read in connection with the evidence to which they are intended to apply." *Chapman v. Commonwealth*, 56 Va. App. 725, 736 (2010) (quoting *Carroll v. Hutchinson*, 172 Va. 43, 52 (1939)). "[T]he trial court has broad discretion over whether to give or deny proposed jury instructions." *Id.*

Jackson submitted a proposed jury instruction on concert of action. She utilized the Virginia Criminal Model Jury Instruction for that phrase but added the language: "[t]he resulting crime must be the natural and probable result of the crime originally contemplated by the parties." The Commonwealth objected to the use of the word "must" in the instruction and argued that the additional language imposed a higher burden upon the Commonwealth than the law demands. The trial court agreed with the Commonwealth.

In proposing the jury instruction, Jackson sought to persuade the jury that she did not share Pettway's intent to kill Sal and, instead, drove Pettway to Sal's house on the night of the murder to

commit vandalism under similar circumstances to their prior actions earlier in the week when they vandalized Shabazz's car.[8]  Thus, she modified the model jury instruction so she could make that argument.  It is true that "lack of intent is usually a defense to a conviction as a principal in the second degree."  *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008).  "The one exception exists when there was concert of action and the resulting crime, whether such crime was originally contemplated or not, is a natural and probable consequence of the intended wrongful act."  *Id.* at 506.

Here, the Virginia model jury instruction sufficiently instructed the jury on concert of action in plain terms.  Jackson's proposed added language was unnecessarily repetitive and imposed a higher burden upon the Commonwealth than the law required.  Thus, the trial court did not abuse its discretion in refusing Jackson's proposed instruction on concert of action.  "When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle."  *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017) (quoting *Daniels v. Commonwealth*, 275 Va. 460, 466 (2008)).

Jackson also submitted a jury instruction on shared criminal intent, which stated that Jackson "must have either known or had reason to know of Jeremy Pettway's criminal intention *and* must have intended to encourage, incite, or aid Jeremy Pettway's commission of the crime."  (Emphasis added).  The Commonwealth objected to the instruction, arguing that it incorrectly provided that shared criminal intent *and* an intent to aid in the commission of the crime were necessary for one to be a principal in the second degree, when the law required only one or the other.  Jackson responded that the instruction was intended to define "shared criminal intent as is referenced in [the] principal in the second degree" instruction.  The trial court agreed with the Commonwealth and declined to give the instruction.

---

[8] The trial court allowed Jackson to argue that theory to the jury.

Instead, the trial court used the model jury instruction for principal in the second degree in instructing the jury that:

> A principal in the second degree is a person who did not actually commit the crime, but rather is present and assists by helping in the commission of the crime. It must be shown that she intended by her words, gestures, signals or actions to encourage, advise, urge, or help the person who actually committed the crime *or* shared in the criminal intent of the person who actually committed the crime.

(Emphasis added). Indeed, "[w]hen the alleged accomplice is actually present and performs overt acts of assistance or encouragement, he has communicated to the perpetrator his willingness to have the crime proceed and has demonstrated that he shares the criminal intent of the perpetrator." *Rollston*, 11 Va. App. at 539 (quoting Groot, *Criminal Offenses and Defenses in Virginia* 183 (1984)).

Here, Jackson's proposed jury instruction suggested that the evidence must prove she knew or had reason to know of Pettway's intent to commit murder *and* that she must have intended to encourage, incite, or aid Pettway's commission of that crime. The model jury instruction, however, clearly provides that Jackson acted as a principal in the second degree if the evidence proved she shared in his criminal intent *or* if she intended to assist him in his commission of the crime. Jackson's instruction is therefore inconsistent with the model jury instruction. Thus, the trial court did not err in refusing Jackson's proffered instruction on shared criminal intent.

## V. Motion for Mistrial

Finally, Jackson contends that the trial court abused its discretion in denying her motion for a mistrial. Assuming without deciding that the trial court's comment to the jury about the need to take attendance for the record in the event the case was appealed was error, we find that the error was waived for purposes of appeal and we conclude that no manifest injustice appears on the record.

"The decision whether to grant a mistrial motion is a matter submitted to the circuit court's sound discretion." *Lewis v. Commonwealth*, 269 Va. 209, 213 (2005). Assignments of error related

to improper comments made to a jury "will not be considered on appeal unless the accused timely moves for a cautionary instruction or for a mistrial." *Harvey v. Commonwealth*, 76 Va. App. 436, 458 (2023) (quoting *Martinez v. Commonwealth*, 241 Va. 557, 559 n.2 (1991)). "In order to avoid a waiver, a mistrial motion must be made 'when the objectionable words were spoken.'" *Id.* (quoting *Yeatts v. Commonwealth*, 242 Va. 121, 137 (1991)). "If defense counsel 'believes that an argument requires or justifies a mistrial, he has the duty to [make a mistrial motion] promptly *before the conclusion of the argument*.'" *Id.* (alteration in original) (quoting *Bennett v. Commonwealth*, 29 Va. App. 261, 281 (1999)). In other words, to preserve an objection to an improper comment, "defense counsel must object contemporaneously, state the basis for the objection, 'articulate . . . clearly the action he desire[s] the court to take' . . . and point out 'that the action need[s] to be taken before the jury retire[s].'" *Id.* (all but third alteration in original) (quoting *Maxwell v. Commonwealth*, 287 Va. 258, 269 (2014)). "There appears to be no exception in Virginia law to the strict application of this rule." *Bennett*, 29 Va. App. at 281.

Here, Jackson failed to take any contemporaneous action or otherwise timely object to the trial court's comments about the need for a record and the possibility of an appeal. The record shows that at the beginning of the third day of trial, the jurors were polled for attendance. The trial court explained that the reason for taking attendance was "if the case gets appealed, the Court of Appeals or Supreme Court needs to look at the record and know that you-all were all here." The trial court further explained, "I know that you're here, but I need to keep it on the record."[9] Jackson did not request a cautionary instruction or make a motion for mistrial at the time the statements were made. Rather, Jackson presented her own evidence and then made a motion to strike without any discussion about the alleged impropriety of the court's comments. It was only after a lengthy

---

[9] The trial court made similar comments to the jury during voir dire, without objection by Jackson. Those comments were not included in Jackson's motion for a mistrial.

discussion on jury instructions that she moved for a mistrial. As a result, the request for relief came too late.[10] *See Maxwell*, 287 Va. at 267-68.

In any event, we note that the trial court instructed the jury before closing arguments that it was "the final arbitrator in this case," which adequately addressed Jackson's complaint and ensured the prevention of any "great injustice" to the defense. *King v. Commonwealth*, 40 Va. App. 364, 373 (2003). Indeed, acting within its discretion, "the court may discharge the jury when it appears . . . that there is a *manifest necessity* for such discharge." Code § 8.01-361 (emphasis added). We find no such "manifest necessity" in this record. As the trial court found, jurors "certainly know there's a record and everybody knows that matters can be appealed." Thus, the court's instruction that they were the final arbitrators in the case resolved the issue. "A jury is presumed to have followed the instructions of the trial court." *Muhammad*, 269 Va. at 524.

We hold that Jackson failed to preserve the motion for a mistrial issue for appeal because an objection was not timely made, and we find that the trial court's comments did not result in any manifest necessity or prejudice to the accused such that discharging the jury would have been appropriate. We affirm the decision.

---

[10] In making her motion, Jackson also alleged that on the prior day, the trial court impermissibly asked Detective Griffin to speak up during her testimony so the court reporter could "take everything down for appellate purposes" and explained that she did not mention it at the time because she did not think the jury paid any attention to the court's comment. Jackson does not cite to any page in the record showing the court's comment, and our review of the record fails to show that any such comment was made. Of course, the fact that Jackson did not mention the trial court's alleged comment to Detective Griffin until the third day of trial also indicates her waiver of the issue.

## CONCLUSION

We affirm Jackson's convictions for murder and conspiracy to commit murder.  We remand this case to the trial court for correction of the typographical error in the corrected final sentencing order.

*Affirmed and remanded.*